United States Court of Appeals,

Eleventh Circuit.

No. 94-3324.

JOHNSON ENTERPRISES OF JACKSONVILLE, INC., a Florida corporation, Plaintiff-Appellee-Cross-Appellant,

v.

FPL GROUP, INC., a Florida corporation, FPL Group Capital, Inc., a Florida corporation, and Telesat Cablevision, Inc., a Florida corporation, Defendants-Appellants-Cross-Appellees.

Dec. 18, 1998.

Appeals from the United States District Court for the Middle District of Florida. (No. 89-893-CIV-j-16), Anthony A. Alaimo, Judge.

Before TJOFLAT and COX, Circuit Judges, and VINING[*], Senior District Judge.

TJOFLAT, Circuit Judge:

A dispute arose between the parties to a construction contract, leading to a fifteen-claim lawsuit by the contractor alleging violations of federal and state criminal statutes and Florida tort law, in addition to breach of contract. Twelve of the claims went to trial. At the close of the evidence, the district court granted judgment as a matter of law on nine of these claims. The jury thereafter returned verdicts for the plaintiff contractor totaling $5.6 million; the district court ultimately entered a final judgment totaling $5.5 million. All parties now appeal: The plaintiff seeks the reinstatement of the claims the district court dismissed; the defendants contest the sufficiency of the evidence to support the jury's verdicts.

In this opinion, we sustain the district court's rulings granting the defendants judgment as a matter of law, set aside the jury's verdicts on damages and limit the plaintiff's recovery to nominal

---

[*]Honorable Robert L. Vining, Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

damages of one dollar for breach of contract, and remand the case for the imposition of attorneys' fees and costs in light of our disposition. The structure of the opinion is as follows: Part I provides the factual background to the dispute. Part II describes the claims brought by the plaintiff and the district court's resolution of those claims. Part III examines the issues raised on cross-appeal by the plaintiff. Parts IV and V examine the issues raised on appeal by the defendants. Part VI addresses the issues of attorneys' fees and costs. Finally, Part VII offers some concluding thoughts.

I.

The legislative backdrop against which this controversy arose was the Cable Communications Policy Act of 1984 (the "Cable Act"). After describing the Cable Act's influence on the cable television market, we discuss the parties, the construction contract, and the dispute that ultimately led to this lawsuit.

A. Background—The Cable Communications Policy Act of 1984

The Cable Act deregulated rates in the cable television industry. *See* Cable Communications Policy Act of 1984, Pub.L. No. 98-549, 98 Stat. 2779 (codified at 47 U.S.C. §§ 521-559) (1984) (amended 1992 and 1996). Prior to the Cable Act, municipalities generally regulated rates for "basic" cable service as a term of the franchise agreement with the cable operator. *See* H.R.Rep. No. 98-934, at 19, 23 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4656, 4660. In exchange for submitting to rate regulation, cable operators were generally given monopolies—once they were granted a franchise, they would not have to compete with another cable operator for customers within the geographic region covered by their franchise. *See* Thomas W. Hazlett, *Duopolistic Competition in Cable Television: Implications for Public Policy,* 7 Yale J. on Reg. 65, 68-69 (1990) (noting that "out of a universe of 9,010 cable systems" in 1987, "municipalities had issued only 165 multiple,

2

overlapping franchise awards");  Michael I. Meyerson, *The Cable Communications Policy Act of 1984:  A Balancing Act on the Coaxial Wires,* 19 Ga.L.Rev. 543, 552 n. 57 (1985) (stating that "over 99% of the cable systems do not face direct competition from another cable system for subscribers").

The Cable Act affected this model by curtailing the power of municipalities to regulate rates for the provision of basic cable service.  The initial effect of this deregulation was to allow incumbent cable operators to extract the monopoly profits previously unavailable to them.  *See* Albert K. Smiley, *Regulation and Competition in Cable Television,* 7 Yale J. on Reg. 121, 121 (1990).  The long-term effect of rate deregulation, however, was supposed to be competition in the cable television market.[1]  Cable companies would now have an incentive to acquire franchises in areas being serviced by an incumbent cable operator and to "overbuild" the incumbent's system by constructing a second cable system, thereby enabling them to compete with the incumbent cable operator for subscribers.[2]

B. The Parties

It was against the backdrop of the Cable Act that FPL Group, Inc. ("Group"), a publically-owned holding company, sought to enter the cable television business.  Group acquired

---

[1]Indeed, Congress had relied on the incentive for competition to ensure that rates remained reasonable.  *See* H.R.Rep. No. 98-934, at 25, *reprinted in* 1984 U.S.C.C.A.N. at 4662 ("The Committee believes that the availability of competing sources of programming in a given market will keep the rates for basic cable services reasonable in that market without the need for regulation.").

[2]An "overbuild" refers to the phenomenon of direct competition between cable systems whereby the new operator builds its cables over top of the cables of the existing operator.  *See* Terry S. Bienstock & James C. Cunningham, Jr., *Florida's Excursion into the Realm of Cable Television Franchising (Part II),* Fla. B.J., Feb. 1988, at 31, 34 n. 2;  Hazlett, *supra* at 65 ("An overbuild occurs when at least two cable operators have been awarded franchises for the same geographical area, and each of them lays duplicate plants in the rights-of-way.")

all of the common stock of the Florida-based Telesat Cablevision, Inc. ("Telesat") in 1985. Group subsequently formed FPL Group Capital, Inc. ("Capital") as a wholly owned subsidiary corporation, and transferred its shares in Telesat to Capital.

Before its acquisition by Group, Telesat was a private cable company—that is, it provided cable television service to multiple-unit dwellings, such as condominiums and apartment complexes, via satellite dish antennas. Because Telesat usually used satellite dish antennas located on the grounds of the housing unit to provide this cable service, it was not necessary that Telesat install cable on public rights-of-way. It was thus not necessary for Telesat to obtain cable franchises from the local government. After Group acquired Telesat, Telesat took steps to acquire such franchises.

In the spring and summer of 1986, Telesat applied for and received six franchises throughout Florida. In each case, an incumbent cable operator was servicing the franchise area; thus, Telesat applied for these franchises with the stated intent of overbuilding the existing system. At this time, Telesat decided to use one independent contractor to perform all of its construction work. After considering the qualifications of at least nine companies, Telesat selected Johnson Enterprises of Jacksonville, Inc. ("JEJ").

C. The Agreement

The initial contract between Telesat and JEJ, signed on August 21, 1986 (the "1986 Contract"), was for an indefinite term and was subject to cancellation by either party without cause on sixty days notice. It was drafted by JEJ's attorney.[3] The key provision of that contract, entitled "Non-exclusive Contract; Right of First Refusal," read:

---

[3]Telesat's attorneys made a few minor modifications, which JEJ's attorneys approved.

4

The parties agree that this is a non-exclusive contract for the construction of Systems throughout the State of Florida, that is, [Telesat] may employ other contractors to do work similar to the work performed by [JEJ] and [JEJ] may perform such work for other [cable system developers], as long as not working in the same franchised area with the exception of Centel Cable. Provided, however, before [Telesat] may offer any major work to other contractors, [Telesat] shall offer such work to [JEJ] and, unless such work is declined by [JEJ] or the parties mutually agree that [JEJ] cannot reasonably perform such additional work in a workmanlike and timely manner, then such work shall be performed by [JEJ] in accordance with this Agreement.

In effect, the contract obligated Telesat to give JEJ first crack at any major construction work Telesat undertook but imposed no obligation on JEJ in return. JEJ could either accept or reject any construction work Telesat offered.

The contract had a number of other important provisions. Under the "Restoration" provision, JEJ agreed that:

[n]ormal restoration to original or better condition of landscape and/or structures, i.e., fences, lawn sprinkler systems, utility lines, and the like, damaged or destroyed will be repaired by [JEJ] at no cost to [Telesat] no later than seven days after notification by [Telesat].

Under the "Indemnification of Owner" provision, JEJ agreed to indemnify Telesat for claims arising from the negligence of JEJ's employees or subcontractors; this indemnification included claims resulting from "termination, disturbance, interruption or other interference with services of any type of aerial or underground installation, utility or other facility damaged, harmed or disturbed or caused to be disturbed by [JEJ]." The "Contractor's Default" provision gave Telesat the right to perform JEJ's obligations and charge JEJ for costs incurred in the event that JEJ defaulted by failing to complete work promptly or to comply with material terms of the contract. This section further provided that Telesat could terminate the contract if such default continued for thirty days or more. The contract also included an integration clause requiring that any changes, modifications, or alterations of the agreement be in writing:

5

This Agreement contains the entire Agreement between [Telesat] and [JEJ]. There are no other agreements or understandings stated or implied except as are contained herein. It is hereby further understood that any changes, modifications or alterations of this Agreement shall be in writing and executed by all parties hereto.

Finally, the parties agreed that the contract would be governed by Florida law, and that the prevailing party in any disagreement would be entitled to attorney fees.

If JEJ accepted work offered by Telesat, JEJ's compensation would be governed by two price lists attached to the contract as Exhibits "A" and "B."[4] Because Telesat would provide all necessary materials, these price lists dealt only with the equipment and labor costs that JEJ would incur in installing the cable system. The price Telesat would pay JEJ for performing a given construction contract would be determined by adding up the units of work involved: For example, in south Florida, Telesat would pay JEJ $3.65 per trench foot for the labor involved in installing cable "at the 30″ depth ... except for bores greater than 2″ in diameter," and would pay $18.00 per hour for JEJ's use of a small trencher to dig the trench.[5]

The procedure Telesat used to offer JEJ construction work was as follows: After Telesat either acquired a franchise or entered into a contract to provide cable service to an apartment complex or other multiple dwelling unit, Telesat sent JEJ a "Notice to Proceed." The notice, which

---

[4]Exhibit A recited composite, per-foot, labor prices for both underground and aerial cable construction, with different prices for the Northern and Southern regions of Telesat's Florida operations. Exhibit A also included a general list of what labor components were included in the composite prices. Exhibit B recited hourly prices for equipment and supplemental personnel. The 1986 Contract also incorporated by attachment Exhibit "C," a list of the materials that JEJ was to purchase and incorporate into the cable system under construction. Exhibit C stated "NONE," however, because Telesat provided all of the materials.

[5]Note, however, that if JEJ thought the prices quoted in Exhibits A and B were too low, JEJ could simply refuse to take the job unless Telesat agreed to certain price increases. If Telesat accepted JEJ's counteroffer, JEJ would perform the construction work for a new price.

constituted an offer, provided JEJ basic information about the job to be performed, such as the location of the project and the commencement date. At the same time, Telesat provided JEJ a set of plans and specifications for the job. If JEJ accepted the offer, it would commence construction according to Telesat's plans and specifications, sending Telesat monthly invoices for work performed in accordance with the price lists in the contract.[6]

JEJ performed work for Telesat under the terms and conditions set out in the 1986 Contract for approximately fifteen months, after which time both parties desired certain modifications. For Telesat, the price lists attached to the 1986 Contract made it difficult to process JEJ's invoices because the Exhibit A list recited composite per-foot labor prices, rather than a breakdown of prices for the individual items included in the composite prices. To eliminate this problem, Telesat asked JEJ to reconstitute the price list. JEJ, in response, asked Telesat to modify the 1986 Contract to provide for a three-year term; such a term would allow JEJ to increase its bank line of credit. JEJ also asked that the price lists in Exhibits A and B be adjusted annually to take into account cost-of-living increases.

In response to these concerns, Glenn Johnson, JEJ's president, and Brian McNamara, Telesat's vice-president for administration, negotiated a new agreement (the "1987 Contract"). The 1987 Contract, signed on November 13, 1987, had a term of two years (thus eliminating a party's

---

[6]As the previous discussion should have made clear, the 1986 Contract was merely anticipatory—in signing it, the parties were looking forward to a series of contracts, each calling for the construction of a separate cable system, that would incorporate the provisions of the 1986 Contract. At trial, the parties did not introduce into evidence any of the notices to proceed that Telesat issued to JEJ following the execution of the 1986 Contract; therefore, we do not know whether the notices explicitly referred to any of the terms or conditions of that contract. The parties, however, appear to have conducted themselves as though the notices incorporated the relevant terms and conditions of the 1986 Contract.

right to terminate the contract on sixty days notice), and included a new set of more detailed price lists. The price lists were attached to the contract as Exhibits "A," "B," and "C."[7] In all other material respects, the 1987 Contract merely repeated verbatim the provisions of the 1986 Contract, including the "Non-exclusive Contract; Right of First Refusal" provision.[8] Furthermore, the procedure by which Telesat offered, and JEJ accepted (or rejected), construction work following the signing of the 1987 Contract remained the same as it had been following the signing of the 1986 Contract.

---

[7]Exhibit A was identical to Exhibit "A" of the 1986 Contract in that it recited composite per-foot labor prices for both underground and aerial cable construction with different prices for the Northern and Southern regions of Telesat's Florida operations. The exhibit also included a detailed "A la Carte" price list that recited prices for individual items. Exhibit B was identical in all respects to Exhibit "B" of the 1986 Contract, quoting hourly rates for the use of equipment and supplemental personnel. As was the case with the 1986 Contract, all of the prices quoted in Exhibits A and B included an undisclosed amount for JEJ's overhead and profit. Exhibit C listed the materials that JEJ would provide for aerial construction; a per-foot price for these materials appeared in Exhibit A. (With the exception of the materials listed in Exhibit C, Section 16 of the contract, entitled "Materials," stated that Telesat would provide all necessary materials required to build the cable system and that JEJ would provide "all necessary tools and construction equipment and ... employ sufficient and competent personnel to do the work in an expeditious and acceptable manner.")

The 1987 Contract also included another exhibit, treated by the parties as Exhibit "D" but not labeled as such, that was not part of the 1986 Contract. This exhibit, entitled "Construction Policy and Procedure Manual," was delivered by Telesat to JEJ at a construction meeting on November 23, 1987. This document contained the "specifications" referred to in the 1987 Contract.

[8]In addition to the 1987 Contract, Johnson gave McNamara a letter that (according to Johnson) McNamara had requested. The letter was dated November 12, 1987 (the day before the 1987 contract was signed), addressed to Brian McNamara, and signed by Glenn Johnson; it recites that it was written to "comfort" Telesat regarding the contract's right-of-first-refusal provision. The letter states that the provision will be construed as it has in the past—"in the spirit of mutual cooperation and benefit rather than in strict adherence to the letter of the contract"—and that JEJ will not exercise its first refusal option when either Telesat's or JEJ's best interests suggest that the use of another contractor would be "mutually beneficial."

Johnson contends, and he so testified at the trial of this case, that on November 13, 1987, before he and McNamara signed the 1987 Contract, he asked McNamara how much construction work McNamara thought Telesat would offer JEJ during the two-year term of the agreement. In response, McNamara showed him a two-page document, entitled "1988 Materials Requisition Budget," that Telesat had recently submitted to Group; the document represented Telesat's estimate of the miles of cable system that, assuming the availability of sufficient funding, Telesat anticipated building in several Florida counties in 1988. The document listed fourteen projects totaling 1255.8 miles of cable system. According to Johnson, McNamara then said, "How's that for a guarantee?" When asked how many miles Telesat planned to build in 1989, McNamara allegedly stated that 1989 would be "as good as 1988," if not better.

At trial, Johnson testified that he construed McNamara's representation as a 1250 miles-per-year mileage guarantee, and that he would not have signed the contract without it. He readily acknowledged, however, that the 1987 Contract contained no mention of this guarantee, and he offered no explanation as to why he failed to have the guarantee written into the agreement before he and McNamara signed it.

D. The Dispute

In July 1988, Telesat offered JEJ a contract to rebuild the underground cable lines at the Pines, a townhouse community in West Palm Beach. JEJ accepted the offer. Testimony at trial indicated that before construction commenced, JEJ personnel met with the Pines' property management staff to ensure that the construction work would not damage the Pines' fragile hydraulic sprinkler system. Sometime after construction began, however, the Pines' sprinkler system sustained extensive damage; the hydraulic tubing lines had been cut, and much of the system was inoperable.

In August, JEJ authorized the Pines to repair the damage to the sprinkler system and send it the bill. JEJ did not pay the bill, however, because it believed that much of the damage had been caused by other contractors hired by Telesat to drop the cable lines into the ground, and that some parts of the sprinkler system repaired by the Pines were inoperable before JEJ began construction. After much communication between JEJ and the Pines, the Pines' property manager informed JEJ, in December 1988, that he was going to send the matter to their attorney. The Pines' attorney subsequently demanded that Telesat pay the repair bill; Telesat, in turn, demanded that JEJ pay for the repairs. When, by March, JEJ had failed to resolve the matter, Telesat informed the Pines' attorney that it would pay for the repairs to the sprinkler system. Telesat then sent JEJ a letter on April 13, 1989, notifying JEJ that it was terminating the 1987 Contract pursuant to the "Contractor's Default" provision, and stating:

> [JEJ] is in default of the [1987 Contract] for its failures to comply with material terms and provisions of the [1987 Contract]. These failures, and [JEJ's] failures to cure after proper notice, have caused injury to Telesat's reputation and business relationships with customers and communities where we seek to do business and have caused Telesat to incur additional costs. [JEJ] and its subcontractors have failed to construct cable systems "in a good and workmanlike manner" as promised, and Telesat can no longer tolerate what appears to be a continuing pattern of unsatisfactory performance.

The letter further stated that JEJ should have all of its construction work completed by April 30, 1989, and that it would be paid for all work performed, and accepted as satisfactory by Telesat, through that date, minus costs incurred by Telesat for restoration, damage, or any other claims arising from JEJ's work.

## II.

The facts outlined in Part I would seem to set the stage for a fairly simple breach of contract action: Telesat claims that JEJ defaulted on its obligations and thus Telesat was justified in

10

terminating their relationship; JEJ claims that it did not default and thus Telesat was in breach of the right-of-first-refusal provision by ceasing to offer work to JEJ. As detailed below, however, the dispute between Telesat and JEJ led to allegations against multiple defendants of fraud, conspiracy, racketeering, defamation, conversion, theft, negligence, promissory estoppel, tortious interference, and breach of fiduciary duty—as well as allegations of breach of contract.

A. The Complaint

JEJ filed a fifteen-count complaint against Telesat, Group, and Capital in the United States District Court for the Middle District of Florida.[9] Fourteen of the counts sought relief under Florida common law and statutes;[10] one count of the complaint sought relief under federal law, specifically, the Racketeer Influenced and Corrupt Organizations Act ("federal RICO"), 18 U.S.C. § 1964(c) (1994).[11]

The fifteen counts of the complaint were preceded by thirty-seven paragraphs of "General Allegations," which, with minor exceptions, were incorporated by reference into each count of the complaint.[12] The "General Allegations" stated that, prior to entering into the 1986 Contract with

_____

[9]Glenn Johnson and Robert Johnson (JEJ's vice president) were also plaintiffs in one of these counts (the defamation claim). Because they were not plaintiffs in the federal RICO claim, however, the district court dismissed their defamation claim for lack of subject matter jurisdiction. These individual claims were not appealed; we therefore do not discuss them any further.

[10]Prior to bringing the federal action, JEJ, Glenn Johnson, and Robert Johnson brought a similar suit in the Circuit Court of Duval County, Florida. That suit was voluntarily dismissed on the same day that the federal suit was filed.

[11]The district court had subject matter jurisdiction over the federal RICO claim under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. The court had supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

[12]The complaint totaled 173 paragraphs and 51 pages, not including exhibits.

JEJ, Telesat devised a corporate plan—in consultation with Group and Capital (both of whom provided Telesat with funding and allegedly controlled its operations)—to carry out a "greenmail" scheme.

The alleged greenmail scheme operated as follows: Telesat applied to local authorities to obtain franchises identical to those held by the incumbent cable operators. In its applications, Telesat stated that if granted a franchise it would (with the financial backing of Group and Capital) build and operate a cable system throughout the franchise area and thus compete with the incumbent cable operator. Accepting Telesat's representations as true, the local authorities approved Telesat's applications and Telesat commenced construction. According to the complaint, however, Telesat was bluffing—it had no intention of actually building a cable system. Instead, Telesat planned to pressure the incumbent cable operators—faced with the prospect of losing their monopoly—into buying it out, at a substantial profit to Telesat's owners, Group and Capital.[13] Meanwhile, the incumbent operators increased the monthly fees charged to their subscribers to cover the cost of Telesat's greenmail activity.

The "General Allegations" stated that Telesat, and thus Group and Capital, duped JEJ into assisting it in carrying out their greenmail scheme. In order to obtain franchises, Telesat needed to show the franchising authorities that it had the technical ability to construct a cable system. To make that showing, Telesat claimed that it had a contractor aboard, JEJ, who had considerable experience constructing cable systems in various areas of the country. Telesat was able to make this

_____

[13]The buyout could be structured in one of two ways: (1) the incumbent operator could form a joint venture with Telesat; or (2) the incumbent operator could purchase Telesat's franchise. Another possibility would have been for Telesat to purchase the incumbent operator's franchise, but there is no evidence that this ever occurred.

claim, the allegations continued, because it had induced JEJ to enter into a contract—first in 1986 and then in 1987—by falsely representing to JEJ that it intended to overbuild and operate a cable system in every location in which it obtained a franchise and that it would give JEJ the first crack, under a right-of-first-refusal clause, at installing these cable systems.

After making these general allegations, JEJ's complaint presented its claims for relief in fifteen separate counts. JEJ's first claim (Count I) was based on federal RICO, which creates a private right of action for persons injured by a "pattern of racketeering activity."[14] Specifically, JEJ alleged that Telesat, Group, and Capital committed mail and wire fraud (18 U.S.C. §§ 1341 and 1343), which are considered "acts of racketeering" under RICO. *See* 18 U.S.C. § 1961(1) (1994). The fraud operated as follows:

> [Telesat, Group, and Capital] conducted or participated in a pattern of racketeering activity ... by fraudulently inducing ... JEJ to expend substantial funds to lease and open offices for the construction of 1250 miles per year of cable television construction, to forego other opportunities, to engage personnel and purchase or lease equipment ... when, in fact, Defendants Telesat, [Group, and Capital] concealed their present intention to sell all rights to various respective franchises and not fulfill their representations.[15]

Based on these allegations, JEJ sought damages of $72,992,646—consisting of actual damages of $24,330,882,[16] which were then trebled in accordance with RICO's treble damages provision, 18 U.S.C. § 1964(c).

---

[14]Federal RICO has four separate provisions relating to racketeering activity, 18 U.S.C. § 1962(a), (b), (c), and (d). JEJ alleged violations of all four provisions. For further discussion of JEJ's RICO claims, see part III.E, *infra*.

[15]JEJ's complaint subsequently was amended to include an allegation of criminal intent.

[16]The calculation of actual damages was based primarily on lost profits from Telesat's failure to provide 1250 miles of construction work per year, but also included a claim for $977,000 that JEJ alleged was owed it in unpaid invoices.

Count II, entitled "Claim under the Florida RICO Act," sought treble damages, again in the amount of $72,992,646, under the Florida Civil Remedies for Criminal Practices Act ("Florida civil RICO"), Fla.Stat. ch. 772.104 (1997), and equitable relief[17] under the Florida RICO Act ("Florida criminal RICO"), Fla.Stat. ch. 895.03(1), (2), (3), and (4) (1997).[18] Count II essentially replicated the allegations underpinning the Count I federal RICO claim, tailoring those allegations to the requirements of Florida law.

Count III, entitled "Breach of Contract," stated that the 1987 Contract consisted of three documents: (1) the signed contractual agreement, (2) the letter Johnson wrote to McNamara on November 12, 1987, and (3) the "1988 Materials Requisition Budget" that McNamara had shown to Glenn Johnson on November 13, 1987. Count III alleged that "[a]n essential element of this contract provided that JEJ would have first refusal on construction for ... Telesat, of at least 1250 miles of cable television construction per year, as evidenced by [the Materials Requisition Budget]."[19]

---

[17]Count II asked the district court to enter an order (1) enjoining the defendants from engaging in "further criminal activity," (2) providing for "the forfeiture of ... Telesat's corporate charter, and for the divestiture or suspension of any cable television franchises," and (3) for "such other and further relief as the Court may deem proper."

[18]The Florida criminal RICO statute allows a private plaintiff to bring a civil suit for equitable relief only. *See* Fla. Stat. ch. 895.05(6) (1997). The Florida civil RICO statute, which "basically tracks the provisions" of the Florida criminal RICO statute (which in turn tracks the "key provisions" of the federal RICO statute), allows a private plaintiff to bring a civil suit for treble damages. *See* 2 David R. McCormack, *RICO* § 9.06, at 9-49 (1997).

[19]In this opinion, we refer to this "essential element" as the "mileage guarantee" or the "mileage promise." JEJ, in its brief on cross appeal, suggests that there is a legally significant difference between a "guarantee" and a "promise." In the context of this case, we perceive no legally significant difference between the two and therefore refer to the mileage guarantee and the mileage promise interchangeably.

Count III further alleged that Telesat breached the 1987 Contract by terminating the agreement on April 14, 1989, by failing to offer JEJ contracts for at least 1250 miles of cable construction work in both 1988 and 1989, and by failing to pay JEJ for construction work performed for Telesat on various jobs commenced after November 13, 1987. For such breaches, JEJ sought judgment against Telesat in the sum of $24,330,882.[20] JEJ sought the same judgment against Group and Capital on the ground that Group and Capital were "estopped from denying liability and financial responsibility for the actions of ... Telesat."

In Count IV of the complaint, entitled "Breach of Contractual Obligation of Good Faith," JEJ alleged that Telesat's failure to honor its mileage guarantee and its failure to pay for work performed constituted a breach of the obligation of good faith performance mandated by Florida Statutes chapter 671.203. JEJ sought the same judgment in Count IV as it did in Count III; again, Group and Capital were allegedly liable for Telesat's breaches on the ground that they were "estopped from denying liability and financial responsibility for the actions of ... Telesat."

Count V, entitled "Alternative Claim for Breach of Modified Contract," alleged that after executing the 1987 Contract, the parties orally modified the contract to include the mileage guarantee. (This is in contrast to Count III, which alleged that the mileage guarantee was part of the original 1987 Contract.) Count V alleged that Telesat breached the 1987 Contract, as modified, by failing to honor the mileage guarantee, and by failing to pay JEJ for work performed, as alleged in Count III. Count V therefore sought the same relief as did Count III: judgment against Telesat, Group, and Capital in the sum of $24,330,882. As in Count III, Group and Capital were allegedly

_____

[20]As noted previously, *see supra* note 16, $24,330,882, represents the profits JEJ contended that it would have made had Telesat honored the mileage guarantee plus the $977,000 due JEJ for work performed.

liable for Telesat's breaches because they were "estopped from denying liability and financial responsibility for the actions of ... Telesat."

As an alternative to the "breach of contract" and "breach of modified contract" counts, the complaint asserted that the facts underpinning those counts supported a claim for promissory estoppel. Count VI, "Alternative Claim of Promissory Estoppel," alleged that Telesat promised to award JEJ contracts for at least 1250 miles of cable system construction per year for 1988 and 1989, that JEJ relied on such representation to its detriment, and that Telesat was thus "estopped from repudiating the promise to build a minimum of 1250 miles of cable television construction per year for two years." JEJ sought the same compensatory damages against Telesat, Group, and Capital in Count VI as it did in Counts III and V; Group and Capital were allegedly liable for such damages because they were "estopped from denying liability and financial responsibility for the actions of ... Telesat."

In Count VII, "Breach of Fiduciary Relationship," JEJ alleged that in entering into the 1987 Contract with Telesat, JEJ "reposed a confidence in" Telesat, Group, and Capital, and "trusted" them to "protect [its] interests...." The contract therefore created a fiduciary relationship between JEJ, as beneficiary, and Telesat, Group, and Capital, as fiduciaries. Count VII alleged that these defendants "breached their fiduciary duty to ... JEJ by failing to build a minimum of 1250 miles [of cable TV system] per year as promised and improperly terminating ... JEJ's contracts," and by failing to pay JEJ for work JEJ had performed for Telesat. JEJ sought the same compensatory damages as those

16

prayed for in Counts III through VI ($24,330,882) plus punitive damages in a sum three times the amount of the compensatory damages ($72,992,646), for a total of $97,323,528.[21]

In Count VIII, "Alternative Claim for Fraud in the Inducement," JEJ alleged that, in conjunction with the execution of the 1987 Contract, "Telesat [aided and abetted by Group and Capital] made false statements of material fact in asserting that a minimum of 1250 miles of cable television construction would be constructed per year for two years during the life of the contract." JEJ alleged that Telesat made these statements with the intent to induce JEJ to enter into the 1987 Contract and materially change its position to its detriment. JEJ sought compensatory and punitive damages.

In Count IX, "Alternative Claim of Negligent Misrepresentation in the Inducement," JEJ alleged that Telesat, Group, and Capital "were negligent in failing to determine the truth or falsity of these false statements [regarding the mileage guarantee] at the time the statements were made," and, at the same time, "acted willfully and wantonly and with a reckless disregard for [JEJ's] rights." JEJ sought compensatory and punitive damages.

In Count X, "Alternative Claim for Conversion," JEJ alleged, in substance, that Telesat, Group, and Capital had tortiously converted the profits that JEJ would have made had Telesat honored the mileage guarantee and paid JEJ the $977,000 due for work performed. JEJ sought compensatory and punitive damages.

Count XI, "Alternative Claim for Civil Conspiracy," alleged that the fraud Telesat perpetrated against JEJ (as previously alleged in Count VIII—the misrepresentation and omission

---

[21]All subsequent claims for compensatory and punitive damages were also for this amount unless otherwise stated.

of "material facts in order to induce ... JEJ to provide ... construction services") was the product of a conspiracy among Telesat, Group, and Capital. JEJ sought compensatory and punitive damages.

Count XII, "Alternative Claim for Civil Theft," alleged that Telesat, at the direction of Group and Capital or aided and abetted by them, "improperly retained funds due and owning to" JEJ for work previously performed, and "fraudulently induced ... JEJ to provide construction services with the criminal intent to deprive ... JEJ of its property." Such conduct constituted theft under Florida Statutes chapters 812.014 and 772.11, thereby rendering the defendants liable for treble damages. Count XII therefore sought judgment for $72,992,646—three times the amount sought in the breach of contract counts.

In Count XIII, "Alternative Claim for Tortious Interference with Contractual Relations," JEJ sought compensatory and punitive damages against Group and Capital on the theory that these defendants "willfully, intentionally and by improper means caused ... Telesat to breach the [1987 Contract] with ... JEJ."

In Count XIV, "Tortious Interference with Contractual Relations with Subcontractors," JEJ claimed that the three defendants, acting "maliciously, willfully and wantonly, and in reckless disregard for [JEJ's] rights," improperly terminated the 1987 Contract for the purpose of hiring JEJ's subcontractors to perform the work that JEJ had previously hired them to perform. Such conduct allegedly constituted tortious interference with JEJ's relations with its subcontractors. JEJ sought compensatory and punitive damages.

Finally, in Count XV, "Defamation," JEJ sought $1,000,000 in compensatory damages and $3,000,000 in punitive damages against Telesat on the ground that Telesat, "in order to justify [its] own wrongful decision to terminate" the 1987 Contract, made false and defamatory statements to

18

"JEJ's subcontractors, other members of the industry, and franchising authorities" regarding JEJ's substandard operations and its "sue happy" nature.

## B. Pre-Trial Proceedings

The defendants moved to dismiss the complaint, and each count thereof, for failure to state a claim for relief.[22] The district court granted their motions to dismiss Count X, "Alternative Claim for Conversion," and Count XII, "Alternative Claim for Civil Theft," but denied their motions to dismiss the remaining counts.[23] Thereafter, each defendant answered the complaint. Their answers were identical in substance.[24] They denied engaging in the wrongful conduct giving rise to JEJ's and the Johnsons' claims for relief, and asserted several affirmative defenses. These defenses alleged, *inter alia,* that the district court lacked subject matter jurisdiction, that the plaintiffs failed to state a claim for relief, and that JEJ's claims were barred by the statute of frauds and the parol evidence rule. Responding to JEJ's claims that Telesat wrongfully breached the 1987 Contract as initially drawn (Count III) and as modified (Count V), the defendants alleged that JEJ had breached the contract in several material respects, thus warranting Telesat's termination of the contract on April 13, 1989.[25] Finally, Telesat alleged that, because of JEJ's breaches, it was entitled to a setoff against any recovery JEJ might obtain.

---

[22]Alternatively, the defendants moved to strike all of the plaintiff's punitive damages pleadings. The court granted the defendants' motion without prejudice. The plaintiffs subsequently repled their punitive damages claims.

[23]After these counts were dismissed, the plaintiffs filed an amended complaint. The amended complaint removed the two dismissed counts; in all other respects, it was exactly the same as the original.

[24]They were also identical in length—each defendant's answer was 201 paragraphs and 17 pages long.

[25]The defendants later amended their answer to include "lack of consideration" as a defense.

19

The defendants then jointly moved the court for summary judgment on all claims.[26] The district court denied the defendants' motions for summary judgment, with the exception of the civil conspiracy count, which it dismissed following the "final" pretrial conference.[27] After the court postponed the trial (to accommodate the schedule of a visiting district judge to whom it had assigned the case for trial), the defendants moved the court to reconsider its ruling denying their motions for summary judgment. The court denied their motion.

C. The trial

The case thus went to trial on all but three of the counts alleged in JEJ's complaint.[28] In its case in chief, JEJ called a variety of witnesses who described the following: Telesat's entry into the cable television market following the enactment of the Cable Act; Group's and Capital's financial interest in Telesat; Telesat's statements to local governmental authorities in its applications for cable franchises, including statements regarding its corporate and financial relationship with Group and Capital and its contractual relationship with JEJ; the incumbent cable operators' resistance to Telesat's applications and, after the applications were granted, their harassment of JEJ's construction

[26]By that time, the parties had taken approximately 63 depositions, consisting of 103 volumes of transcript, and had propounded numerous interrogatories and requests for production. On the eve of trial, the total number of depositions was up to 69, and the parties had listed a combined total of 214 trial witnesses and 2784 exhibits.

[27]This case changed hands twice in the district court. The case was initially assigned to then-Chief Judge John H. Moore II, who set a trial date of January 13, 1992. Judge Moore held the "final" pretrial conference at which the civil conspiracy count was dismissed. Due to some pressing matters that precluded his trial of the case, Judge Moore postponed the trial and subsequently reset the case for trial on March 30, 1992, before Judge W. Brevard Hand of the Southern District of Alabama. When Judge Hand's schedule could not accommodate the trial, Judge Moore assigned the case to Judge Anthony A. Alaimo of the Southern District of Georgia. Judge Alaimo, after holding another "final" pretrial conference (which turned out to be the real final pretrial conference), tried the case the following June.

[28]The three claims dismissed prior to trial were civil conspiracy, conversion, and civil theft.

20

operations (on behalf of Telesat) in the field;[29]  Telesat's long range plans;  areas in which Telesat,

after obtaining a cable franchise, aborted its construction plan;  Group's involvement in Telesat's

negotiations with incumbent cable operators, some of whom entered into a joint venture with

Telesat;  Group's reaction to Telesat's complaints about JEJ's performance on the job;  and Group's

involvement (through one or more officers or directors of Group who were officers or directors of

Telesat) in Telesat's decision to terminate the 1987 Contract.

JEJ also called expert witnesses to establish its case for damages.  They included a certified

public accountant, Harold C. Farnsworth, and an economist, Dr. Frederick Raffa, both of whom

testified regarding the lost profits and loss of business value JEJ sustained because Telesat failed to

award it contracts for the construction of 1250 miles of cable system during each year of the 1987

Contract.

At the close of the plaintiff's case, the defendants moved the court pursuant to Fed.R.Civ.P.

50(a) to enter judgment as a matter of law on each of JEJ's claims.[30]  The court reserved ruling on

---

[29]According to JEJ personnel, incumbent operators would send employees to JEJ work sites to look for (and document) any evidence of harm caused by JEJ to the incumbent operator's cables (over which JEJ was laying Telesat's cables).  Additionally, the incumbent operators were required to provide maps of the public rights-of-way in which their cables had been laid;  JEJ alleges that incumbent operators intentionally provided maps that were poor and misleading in order to make JEJ's job more difficult.

[30]Federal Rule of Civil Procedure 50(a) provides:

> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
>
> (2) Motions for judgment as a matter of law may be made at any time before

21

their motions.[31] The defendants then presented their cases, during which JEJ withdrew its claim for defamation.[32] At the close of all of the evidence, the defendants once again moved for judgment as a matter of law on all counts lodged against them.

The district court granted Capital's motion in full. Group's motion was granted on all counts except breach of contract, tortious interference with contractual relations, and tortious interference with contractual relations with subcontractors. Telesat's motion was granted on all counts except breach of contract and tortious interference with contractual relations with subcontractors.[33]

In granting the Rule 50(a) motions, the district court struck the purported "mileage guarantee" from the case, and thus (in effect) dismissed JEJ's claim for the profits it allegedly lost because Telesat had failed to award it contracts for the construction of 1250 miles of cable system both in 1988 and in 1989. JEJ's only remaining claim for breach of contract damages was for $977,000 in unpaid invoices. The district court, however, permitted JEJ to argue to the jury a claim not included in any count of the complaint—a claim for the profits JEJ would have made on

> submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

[31]The court stated that it would reserve ruling until it heard the defendants' evidence. What the court probably meant was that it would entertain defense motions for judgment as a matter of law after the defendants put on their case, not that the court would revisit their motions and determine whether the plaintiff's case, standing alone, established one or more claims for the jury. Rule 50(a) does not authorize a trial judge, after the defense has presented its case (in whole or in part), to revisit, and grant, a defense motion for judgment as a matter of law made at the close of the plaintiff's case without considering, in addition to the evidence presented in the plaintiff's case, the evidence presented by the defense.

[32]The court dismissed this claim with prejudice.

[33]In granting judgment as a matter of law on the Florida RICO claims, the district court dismissed both the criminal RICO claim for equitable relief and the civil RICO claim for damages.

22

construction contracts Telesat gave to other contractors between April 13, 1989, when Telesat terminated the 1987 Contract, and November 12, 1989, when the contract's two-year term expired, allegedly in derogation of JEJ's right of first refusal.[34]

The district court submitted the case to the jury under a special verdict,[35] which included four sets of interrogatories. The first set was entitled "Piercing the Corporate Veil." Answering the interrogatories in this set, the jury found that Group "operated Telesat as a mere instrumentality for ... Group's own improper purpose," that "JEJ was deceived by ... Group's improper use of Telesat," and that "JEJ suffered damages proximately caused by ... Group's improper use of Telesat."

Answering the interrogatories in the second set, entitled "Breach of Contract Claim," the jury found that "Telesat breached the November 13, 1987, contract by wrongfully terminating JEJ's services," and that JEJ sustained damages in the sum of $1,500,000. Of that sum, $300,000 represented amounts due JEJ for work performed on unspecified Telesat projects, and $1,200,000 represented the profits JEJ would have made from jobs Telesat gave other contractors (in derogation of JEJ's "Right of First Refusal") from April 13, 1989, to November 12, 1989. Relying on their answers to the first set of interrogatories, the jury found Group liable for Telesat's breaches and thus for the $1,500,000 in damages JEJ had sustained.[36]

---

[34]In essence, the district court permitted JEJ to amend its complaint to conform to the evidence. *See* Fed.R.Civ.P. 15(b). The district court did so despite a pretrial order in which it stated that amendments to conform to the evidence would not be permitted.

[35]*See* Fed.R.Civ.P. 49(a).

[36]The answers to the second set of interrogatories provided the basis for the entry of judgment against Telesat. These answers, coupled with the jury's answers to the first set of interrogatories on veil piercing, provided the basis for the entry of judgment against Group.

23

Answering the interrogatories in the third set, entitled "Claim of Tortious Interference with the November 13, 1987 Contract," the jury found that "Group wrongfully caused or directed Telesat to breach the ... contract," that JEJ sustained $1,500,000 in damages as a result of the breach, and that the evidence "warrant[ed] the award of punitive damages" against Group in the amount of $4,000,000.

Answering the interrogatories in the fourth set, entitled "Claim of Tortious Interference with Contractual Relations with Subcontractors," the jury found that "Telesat improperly interfered with JEJ's relationship with its subcontractors," but that Group did not. The jury also found that the evidence warranted an award of punitive damages in the amount of $100,000 against Telesat.[37]

D. Post-Trial proceedings

After the jury returned its special verdict, Telesat and Group, pursuant to Federal Rule of Civil Procedure 50(b),[38] renewed their motions for judgment as a matter of law, made at the close of the evidence, on the claims the court submitted to the jury.[39] At the same time, JEJ moved the

---

[37]The jury found in favor of Group on the issues covered by the fourth set of interrogatories, notwithstanding its response to the first set of interrogatories, in which it found that Group had "operated Telesat as a mere instrumentality for ... Group's own improper purposes."

[38]Rule 50(b) provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59.

Fed.R.Civ.P. 50(b).

[39]Although Telesat and Group did not move alternatively for a new trial, their motion for judgment as a matter of law raised issues that did not go to the legal sufficiency of JEJ's

court to reconsider its rulings granting the defendants judgment as a matter of law and to grant JEJ a new trial on the claims that the court had dismissed.

The court denied JEJ's motion. The court granted Telesat's motion as to the "tortious interference with contractual relations with subcontractors" claim, striking the jury's $100,000 punitive damages award on the ground that JEJ conceded that it had sustained no compensable injury—a prerequisite to the recovery of punitive damages under Florida law—as a result of Telesat's tortious interference.[40] In all other respects, Telesat's and Group's motions were denied.

After ruling on the parties' motions for post-judgment relief, the court addressed the parties' motions for attorneys' fees and costs. Section 35 of the 1987 Contract, entitled "Attorney Fees," provided:

> Should it become necessary for either party to bring legal action or engage legal counsel by virtue of any disagreement between the parties of this Agreement, the prevailing party shall be entitled to receive, in addition to any other amounts, a reasonable sum as and for attorney fees, together with the cost thereby incurred, should it succeed in its actions.

Telesat claimed that it was entitled to recover attorneys' fees under Section 35 of the contract, because it prevailed on JEJ's contract claim (insofar as it was based on the mileage guarantee) and on JEJ's tort claims rooted in the 1987 Contract. All defendants claimed entitlement to attorneys' fees under the "attorney's fee" provision of the Florida civil RICO statute, because they had

_____

evidence; rather, the issues concerned alleged trial court errors in the admission and exclusion of evidence. For example, Telesat and Group contended that "the evidence of "greenmail' was irrelevant to [JEJ's] tortious interference claim."

[40]Under Florida law, in a civil action based on misconduct in commercial transactions, including those involving willful, wanton, or gross misconduct, a judgment for punitive damages may not exceed three times the amount of compensatory damages awarded. *See* Fla. Stat. ch. 768.73(1)(a) (1997).

prevailed on JEJ's Florida civil RICO claim.[41]  Finally, the defendants asked for an award of costs under Rule 54 of the Federal Rules of Civil Procedure.  Meanwhile, JEJ claimed that it was entitled to attorneys' fees under Section 35, because it prevailed on its breach of contract claim (as that claim stood after the court struck the mileage guarantee).  JEJ also moved the court for an award of costs under Rule 54.

The district court denied the parties' motions for attorneys' fees and costs, with the exception of Capital's Rule 54 motion for costs, which the court granted.  The court then entered final judgment—pursuant to the jury's findings and its order disposing of the parties' post-trial motions—as follows:  against Telesat and Group, jointly and severally, in the sum of $1,500,000 in compensatory damages, and against Group in the sum of $4,000,000 in punitive damages.

Following the entry of final judgment, Telesat, Group, and Capital appealed.  Telesat and Group appealed the district court's ruling denying their post-trial Rule 50(b) motions for judgment as a matter of law as to JEJ's breach of contract claim, and Group appealed the court's denial of its Rule 50(b) motion as to JEJ's tortious interference with contractual relations claim.  In addition, Telesat appealed the district court's denial of its motion for attorneys' fees under Section 35 of the 1987 Contract;  Telesat and Group appealed the district court's denial of their motion to tax costs under Rule 54;  and Telesat, Group, and Capital appealed the district court's denial of their motion for attorneys' fees for successfully defending JEJ's Florida civil RICO claim.

---

[41]Florida Statutes chapter 772.104 provides that a defendant "shall be entitled to recover reasonable attorney's fees and court costs in the trial and appellate courts upon a finding that the claimant raised a claim which was without substantial fact or legal support."

JEJ cross-appealed, challenging the district court's entry of judgment as a matter of law for Capital on all counts.[42] JEJ also cross-appealed the judgment as a matter of law for Telesat and Group on federal RICO, Florida civil RICO, breach of contractual obligation of good faith, and fraudulent inducement, and the district court's decision to strike the mileage guarantee from the breach of contract and breach of modified contract claims.[43] In addition, JEJ cross-appealed the district court's denial of its motion for attorneys' fees under Section 35 of the 1987 Contract.

### III.

In this part, we address—and reject—all of JEJ's appeals. Parts III.A and III.B examine the district court's decision to strike the mileage guarantee from JEJ's breach of contract and breach of modified contract claims. Part III.C addresses JEJ's claim that the defendants violated a statutorily-imposed contractual obligation of good faith, and part III.D examines JEJ's claim for fraudulent inducement. Part III.E considers JEJ's federal and state RICO claims. Finally, part III.F discusses the dismissal of Capital from the case.

Our review of a district court's grant of a Rule 50 motion for judgment as a matter of law is *de novo;* we apply the same standard that the district court applied in addressing the motion. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 439 (11th Cir.1996).[44] In doing so,

---

[42]JEJ's brief does not indicate which counts against Capital should have been submitted to the jury; we therefore assume that JEJ contends that the jury should have received all counts (as suggested by its notice of appeal).

[43]JEJ challenged other rulings of the district court in its notice of appeal; however, it briefed only those issues listed above. Claims not presented to the court of appeals are considered waived. *See Cervi v. Kemp,* 855 F.2d 702, 705 n. 8 (11th Cir.1988).

[44]As an initial matter, we note that, with the exception of the Count I federal RICO claim, all of JEJ's claims were based on Florida law. Therefore, with respect to those claims, we look to Florida substantive law for the rule of decision. Federal law, however, provides the rule of procedure. The sufficiency of the evidence to create a case for the jury is a procedural issue to

we consider all the evidence in the light most favorable to the nonmoving party, and "independently determine whether the facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict." *Pulte Home Corp. v. Osmose Wood Preserving*, 60 F.3d 734, 739 (11th Cir.1995) (internal quotation marks and citations omitted). "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law." *Isenbergh*, 97 F.3d at 439. If "the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof," then the entry of judgment as a matter of law is appropriate. *Pulte Home Corp.*, 60 F.3d at 738 (internal quotation marks and citations omitted).

A. Breach of Contract

In Count III of the complaint, "Breach of Contract," JEJ claimed damages resulting from Telesat's breach of a guarantee in the 1987 Contract of 1250 miles of construction work per year. We reject this claim on two grounds. First, the alleged mileage guarantee was not part of the written 1987 Contract, and the parol evidence rule prevents the written contract from being modified by an oral agreement. Second, and more fundamentally, JEJ gave no consideration in exchange for the mileage guarantee, and thus no contract was formed.

1.

JEJ alleged that the 1987 Contract consisted of three documents that, considered together, establish the mileage guarantee. The first document is the 1987 Contract itself, the second is

which we apply federal law. *See Excel Handbag Co. v. Edison Bros. Stores, Inc.,* 630 F.2d 379, 383-84 (5th Cir.1980) ("This Court uniformly has held ... that the federal rather than the state test should be applied to determine if there is sufficient evidence to create a jury question because the issue is one of procedural rather than substantive law."); *see also ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.,* 374 F.2d 455, 460 (5th Cir.1967).

Telesat's "1988 Materials Requisition Budget," and the third is a letter from Glenn Johnson to Brian McNamara, in which Johnson states that he is writing to "comfort" Telesat regarding the Section 38 right-of-first-refusal provision.[45]

We reject the assertion that these documents establish a mileage guarantee. The 1987 Contract itself says nothing about a mileage guarantee, and the other two documents are not attached as exhibits or in any other way incorporated into the written contract. As for the "1988 Materials Requisition Budget," that document reflects Telesat's estimate of the miles of cable system that, assuming local government approval of Telesat's pending franchise applications and Group's willingness to support Telesat's construction plans, Telesat anticipated building in several Florida counties in that calendar year. It contains no language other than the names of the affected Florida counties, and, opposite the names, the word "Franchise" or "Private," abbreviations for the months of calendar year 1988, and "Totals" for the "Central," "Western," and "Southern" districts' mileages. The allegation that the Materials Requisition Budget evidences "an essential element of [the 1987 Contract] ... that JEJ would have first refusal on construction for ... Telesat, of at least 1250 miles of cable television construction per year" is disingenuous. The Materials Requisition Budget contains nothing that could be considered a contract provision, and therefore nothing that could be read as a mileage guarantee. As for the "comfort" letter, it also evidences nothing about a mileage guarantee.

---

[45]This letter is described in more depth in note 8, *supra.*

Because the mileage guarantee was not part of the written 1987 Contract, JEJ's claim is reduced to a claim that the mileage guarantee was an oral agreement that should be used in interpreting the written agreement.[46] As such, the claim is barred by the parol evidence rule.

In Florida, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract."[47] *Chase Manhattan Bank v. Rood,* 698 F.2d 435, 436 (11th Cir.1983). This rule applies when the parties intend that a written contract incorporate their final and complete agreement. One way to demonstrate such intent is through the use of a merger clause. *See* E. Allan Farnsworth, *Contracts* § 7.3, at 476 (2d ed. 1990). In this case, a merger clause is found in Section 22 of the 1987 Contract, entitled "Entire Agreement," which states:

> This Agreement contains the entire Agreement between [Telesat] and [JEJ]. There are no other agreements or understandings stated or implied except as are contained herein. It is hereby further understood that any changes, modifications or alterations of this Agreement shall be in writing and executed by all parties hereto.

When a contract contains such a merger clause, the agreement is deemed to be "integrated," such that evidence of prior or contemporaneous agreements shall not be admitted to contradict the terms of the contract.

---

[46]The alleged guarantee, as described in part I.C, *supra,* was based on the following sequence of events: Immediately prior to the signing of the 1987 Contract, McNamara—in response to Glenn Johnson's inquiry as to how many miles of cable system Telesat anticipated building over the next two years—showed Johnson the "1988 Materials Requisition Budget" and, according to Johnson, said "How's that for a guarantee?" As for 1989, McNamara supposedly said that 1989 would be "even better."

[47]The parol evidence rule is not a rule of evidence, but rather is a substantive rule of law. *See Knabb v. Reconstruction Fin. Corp.,* 144 Fla. 110, 197 So. 707, 715 (Fla.1940). We therefore apply Florida law on this issue. *See supra* note 44.

There are, however, several exceptions to the parol evidence rule that permit the introduction of evidence of prior oral agreements even though the final written contract was intended to be integrated. We address two of these exceptions—parol evidence may be admitted (1) to show that the oral agreement induced the signing of the written contract, or (2) to explain a latent ambiguity in the written contact.

As for the first exception, Florida courts recognize an "inducement" exception to the parol evidence rule whereby "parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change, or reform the instrument." *Mallard v. Ewing,* 121 Fla. 654, 164 So. 674, 678 (Fla.1936). The party submitting parol evidence under this exception, however, carries a heavy burden of proof. *See Healy v. Atwater,* 269 So.2d 753, 755 (Fla. 3d DCA 1972). The inducement exception "requires the [oral] agreement to be shown by evidence that is *clear, precise, and indubitable;* that it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify, and that they narrate the details exactly and that their statements are true." *Mallard,* 164 So. at 678 (emphasis added); *see also Rood,* 698 F.2d at 438. As the trial judge noted, in applying the inducement exception, "we do not believe that, when the existence of the contemporaneous oral agreement rests solely on a credibility choice between two witnesses, the proof of that accord is "clear, precise, and indubitable.' " *Rood,* 698 F.2d at 438 n. 4 (quoting *Mallard,* 164 So. at 678).

Having reviewed the record, including McNamara's testimony denying the existence of an oral mileage guarantee and Johnson's inconsistent testimony regarding the substance of the alleged guarantee, we agree with district court that JEJ's evidence concerning the oral mileage guarantee was

31

not "clear, precise, and indubitable." The district court, therefore, correctly held that the evidence was inadmissible under the inducement exception to the parol evidence rule.

As for the second exception, JEJ argues that the district court erred in excluding Johnson's testimony regarding the mileage guarantee because such testimony was admissible to explain a "patent ambiguity" in the 1987 Contract. JEJ asserts that the term "cable TV system" is patently ambiguous.[48] Under Florida law, however, parol evidence is not admissible to explain a patent ambiguity; it is admissible to explain only a latent ambiguity.

> [A] patent ambiguity is that which appears on the face of the instrument and arises from the use of defective, obscure, or insensible language. Extrinsic evidence is inadmissible if the ambiguity is patent, because such evidence would, in effect, allow the court to rewrite the contract for the parties by supplying information the parties themselves did not choose to include. A latent ambiguity, on the other hand, is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings. In such instance, this evidence is required because the instrument itself does not provide sufficient insight into the intent of the parties.

*Crown Management Corp. v. Goodman,* 452 So.2d 49, 52 (Fla. 2d DCA 1984) (citations omitted); *see also Carson v. Palmer,* 139 Fla. 570, 190 So. 720, 722 (Fla.1939); *Blazina v. Crane,* 670 So.2d 981, 983 (Fla. 2d DCA1996); *Landis v. Mears,* 329 So.2d 323, 325-26 (Fla. 2d DCA 1976); 3 *Corbin on Contracts* § 536, at 26 (1960) (discussing admissibility of evidence to aid in interpreting terms in contracts and stating that "evidence of surrounding circumstances will be admissible only in cases of latent ambiguity"). Because JEJ contends that the term "cable TV system" was a patent,

---

[48]The preamble to the 1987 Contract states, "Whereas [Telesat] desires to construct an aerial and underground *cable TV system* ("Systems') in the State of Florida...." (emphasis added). The same phrase appears in the 1986 Contract. Thus, JEJ is making the dubious claim that the meaning of the term "cable TV system" changed from one contract to the next—it connoted a mileage guarantee in the 1987 Contract but not in the 1986 Contract.

not a latent, ambiguity, and because a patent ambiguity may not be explained by parol evidence, JEJ's argument fails.

Accordingly, the district court ruled correctly when it invoked the parol evidence rule to exclude Johnson's testimony and to strike the mileage guarantee from the 1987 Contract.[49]

2.

We also affirm the decision to strike the mileage guarantee from the 1987 Contract on the ground (not relied upon by the district court) that the mileage guarantee was unenforceable for lack of consideration.[50]

---

[49]The mileage guarantee could perhaps be seen as a separate agreement from the 1987 Contract (rather than as evidence modifying that contract), and thus the parol evidence rule would not apply. In such a situation, however, the contract would be invalid under the statute of frauds. Florida's statute of frauds, entitled "Unenforceable Contracts," provides that "[n]o action shall be brought ... upon any agreement that is not to be performed within the space of 1 year from the making thereof ... unless the agreement or promise upon which such action shall be brought ... shall be in writing and signed by the party to be charged therewith." Fla. Stat. ch. 725.01 (1997). By its terms, the *two-year* oral mileage guarantee could not be performed within one year, and the enforcement of that guarantee is thus barred by Florida's statute of frauds. *Cf. Khawly v. Reboul,* 488 So.2d 856 (Fla. 3d DCA 1986) (finding that statute of frauds barred both breach of contract and fraud in the inducement claims because alleged oral agreement could not be performed within one year); *Ashland Oil, Inc. v. Pickard,* 269 So.2d 714, 721 (Fla. 3d DCA 1972) ("The Florida rule is that the statute of frauds may not be avoided by a suit for fraud based on oral representations....").

[50]Telesat raised this ground in its answer, in its memorandum in support of its motion for summary judgment, and (by reference) in its Rule 50(a) and 50(b) motions for judgment as a matter of law. The district court, however, in denying these motions, did not explicitly address this ground. Nevertheless, we may rely on this argument in our decision. *See Bonanni Ship Supply, Inc. v. United States,* 959 F.2d 1558, 1561 (11th Cir.1992) (noting that "this court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court" and affirming grant of summary judgment on alternative ground); *see also United States v. Blue Cross & Blue Shield of Ala.,* 156 F.3d 1098, 1110 (11th Cir.1998) (affirming district court's dismissal of case on alternative ground); *Lee v. Hughes,* 145 F.3d, 1272, 1277 n. 6 (11th Cir.1998) (same).

33

It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration. *See Restatement (Second) of Contracts* § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). In a bilateral contract, the exchange of promises by both parties constitutes consideration:

> [T]he courts in general require that before mutual promises will be enforced, each as the consideration of the other, each party must promise to do something which will yield a benefit or advantage to the other, or which will result in a detriment or disadvantage to himself in exchange for the other promise. Whatever may be the character of the thing promised, as a general rule it cannot serve as consideration unless it is binding.... [M]utual promises in each of which the promisor undertakes some act or forbearance that will be, or apparently may be, detrimental to the promisor or beneficial to the promisee, and neither of which is void, will qualify as consideration sufficient to support one another.

*Williston on Contracts* § 7:6, at 77-79, 87 (footnotes omitted).

If, however, "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor—who says, in effect, "I will if I want to' "—then that promise may be characterized as an "illusory" promise, i.e., "a promise in form but not in substance." Farnsworth, *Contracts* § 2.13, at 75-76 (1990). An illusory promise does not constitute consideration for the other promise, and thus the contract is unenforceable against either party. *See id.; Williston on Contracts* § 7:7, at 88-89 ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration.... In such cases, where the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration." (footnote omitted)).

Florida law adheres to these basic contract principles.[51] *See Rosenberg v. Lawrence,* 541 So.2d 1204, 1206 (Fla. 3d DCA 1988); *Pick Kwik Food Stores, Inc. v. Tenser,* 407 So.2d 216, 218 (Fla. 2d DCA 1981).

The 1987 Contract between Telesat and JEJ recites the giving and receipt of consideration.[52] Upon closer inspection, however, it becomes clear that JEJ gave nothing in exchange for any of Telesat's promises—including any mileage promise.[53]

The 1987 Contract placed no obligations on JEJ in terms of either quantity of work performed or price charged for such work. The "right of first refusal" provision makes clear that JEJ

---

[51]The Florida cases sometimes refer to this concept of lack of consideration due to an illusory promise as "lack of mutuality." *See Pick Kwik Food Stores, Inc. v. Tenser,* 407 So.2d 216, 218 (Fla. 2d DCA 1981) (holding executory features of a contract "void from the beginning for lack of consideration or, as the rule is sometimes expressed, for lack of mutuality"). The interchangeable use of "lack of consideration" and "lack of mutuality" is common; however, it has been argued that for the sake of avoiding confusion, the concept is preferably expressed in terms of consideration. See *Williston on Contracts* §§ 7:6, 7:14; *Restatement (Second) of Contracts* § 79, at 200. In applying this proposition of law to the 1987 Contract, we discuss this issue in terms of consideration rather than mutuality.

[52]The preamble to the 1987 Contract states, "NOW, THEREFORE, in consideration of the premises and for other good and valuable considerations, the receipt and sufficiency of which is hereby severally acknowledged, the parties warrant, covenant and agree as follows...."

[53]Glenn Johnson testified at trial that JEJ was, in fact, obligated to perform 1,255.8 miles of construction for Telesat (i.e., the mileage guarantee was mutual), although Johnson admitted that this obligation was not written into the 1987 Contract. If JEJ were required to complete any construction, then the contract would have been supported by consideration. It is unfathomable that such an obligation would exist, however, given JEJ's right of first refusal (which, unlike any minimum construction requirement, appears in the written contract). Under Glenn Johnson's "mutual mileage guarantee" scenario, Telesat was required only to offer 1250 miles of construction to JEJ, and JEJ was required to complete the same amount; thus, if JEJ refused any work offered by Telesat, and Telesat offered only 1250 miles of construction, then JEJ automatically would have breached the contract. Thus, JEJ's purported minimum construction requirement would essentially render the right of first refusal meaningless; we therefore interpret JEJ's claim of a mileage guarantee as merely a promise by Telesat to offer 1250 miles of construction work per year.

35

could turn down every offer from Telesat, and thus do no work whatsoever. In addition, JEJ's right of first refusal gave it the option—albeit tacitly—to renegotiate, at any time, the prices that it would charge Telesat for performing cable system construction work. The 1987 Contract contained price lists: Exhibits A, B, and C. The parties treated Telesat's contract offers as if they incorporated those price lists by reference; thus, when JEJ accepted a Telesat offer, it billed Telesat for work performed using the prices quoted in the price lists. If JEJ believed that the listed prices were too low, it could simply reject Telesat's offer. JEJ presumably would do so if the prices a competitor would charge Telesat for the work would be significantly higher. In that event, JEJ would likely make a counteroffer.[54]

The net effect of the parties' arrangement was that the prices listed in Exhibits A, B, and C were merely a starting point for JEJ. If the prevailing "market" prices—those quoted by JEJ's competitors—were significantly higher than those contained in Exhibits A, B, and C, then JEJ would likely make a counteroffer with prices somewhere between those quoted in the exhibits and those prevailing in the market. Telesat, however, was constrained by the contract price lists. If the prices quoted in Exhibits A, B, and C were higher than those prevailing in the market, Telesat could not renegotiate—it would have to offer the work to JEJ at the prices quoted in the exhibits. JEJ, in turn, would almost certainly accept the offer.

---

[54]Nothing in the 1987 Contract precluded JEJ from making a counteroffer on any terms that it chose. JEJ could counteroffer a cost-plus contract, or a fixed-price contract, or a contract of the type used in this case. The contract price JEJ proposed could be higher than the price dictated by the price lists attached as exhibits to the 1987 Contract; in addition, JEJ could modify the provisions of that agreement that were to control how future construction contracts were to be performed and how the risks were to be allocated between the parties.

According to the evidence JEJ presented in its case in chief, the incumbent cable operators, in their campaign to forestall Telesat's looming competition, made it known that any contractor who did business with Telesat would be "blackballed."  The incumbent operators targeted JEJ, and put it on the blackball list, because JEJ was Telesat's principal contractor.[55]  We must assume that in agreeing to the prices quoted in Exhibits A, B, and C, JEJ took the risk of being blackballed into account.  We must also assume that JEJ's competitors would take the risk into account in deciding whether to accept a Telesat contract offer that JEJ rejected.  In either event, the analysis we set out above holds true:  JEJ would be expected to reject any Telesat offer that was too low—that is, an offer that JEJ's competitors would reject—and to make a counteroffer at a higher price.

Having concluded that the price lists did not entail any consideration from JEJ, we turn to two other items in the contract that are possible sources of consideration.  The first is contained within the right-of-first-refusal provision;  it states that JEJ "may perform such work for other purchasers [besides Telesat], as long as not working in the same franchised area."  The implication is that JEJ could not work for any system operator other than Telesat in an area in which Telesat has a franchise.  Such an agreement is an illegal contract in restraint of trade;[56]  as such, JEJ's concessions thereunder could not constitute valid consideration.  *See Castro v. Sangles,* 637 So.2d 989, 990 (Fla. 3d DCA 1994) (holding that a contract in violation of a Florida statute is void); *Thomas v. Ratiner,* 462 So.2d 1157, 1159 (Fla. 3d DCA 1984) (same).  The second possible source of consideration is the attorneys' fees provision (discussed at length in part VI, *infra*).  That

---

[55]The alleged harassment by incumbent operators is described in note 29, *supra.*

[56]Florida law prohibits all contracts in restraint of trade, with certain exceptions that are not relevant here.  *See* Fla. Stat. ch. 542.33 (1997);  *see also* Fla. Stat. ch. 542.331 (1997) (repealing chapter 542.33 but stating that it continues to govern contracts entered into before July 1, 1996).

provision, however, would impose a cost on JEJ only if JEJ breached another provision of the contract. Because JEJ had no obligations under the contract, it would be impossible for JEJ to be in breach. Thus, JEJ's commitment to pay attorneys' fees is illusory, and could not serve as consideration.

In sum, while Telesat bound itself to offer JEJ all of its construction work, JEJ promised nothing of substance in return; JEJ would accept the work if doing so would be in its self-interest, however it might perceive that interest to be. Such a "promise" was illusory and could not serve as adequate consideration for Telesat's promise. Telesat's obligation, under the right-of-first-refusal clause, to offer JEJ *any* work—let alone 1250 miles of construction work in each year of the 1987 Contract—is therefore unenforceable. This means that the 1987 Contract had no more legal effect than an unsigned piece of paper indicating that the parties intended to enter into a series of construction contracts that would incorporate by reference some of the provisions appearing on the paper—provisions dealing with how the construction contracts would be performed, how JEJ would be paid, and who would bear the responsibility of, among other things, providing insurance and restoring the job site to its former condition.

For the foregoing reasons, we conclude that the 1987 Contract lacked consideration and thus affirm the district court's decision to strike the alleged oral mileage guarantee from Count III of JEJ's complaint.[57]

---

[57]After taking this case under submission following oral argument, we asked counsel for the parties for record citations that described the consideration, if any, that JEJ may have given Telesat for its right of first refusal. Telesat's attorneys cited no consideration. Counsel for JEJ cited the fact that the price lists attached to the 1987 Contract were lower than the rates contractors were charging cable operators for construction work; according to counsel, JEJ agreed to discount its prices in order to induce Telesat to enter into the contract. This alleged discount did not constitute consideration, however, because it left JEJ in the same position we

B. Breach of Modified Contract

In the alternative, Count V of JEJ's complaint ("Alternative Claim for Breach of Modified Contract") alleges that "[s]ubsequent to the execution of the [1987 Contract] ... the parties agreed to modify the contract to include the construction of at least 1250 miles of cable television construction per year." Glenn Johnson testified at trial that this oral mileage guarantee was made on November 13 by Brian McNamara immediately *before* he and McNamara signed the contract. Nothing introduced into evidence at trial indicated that the McNamara guarantee was made *after* that event. Given this absence of proof, we affirm the district court's grant of judgment as a matter of law as to Count V.[58]

C. Breach of Contractual Obligation of Good Faith

In Count IV, JEJ alleged that Telesat breached the contractual obligation of good faith imposed by Florida Statutes chapter 671.203, a provision of the Uniform Commercial Code (U.C.C.), by failing to offer JEJ contracts for the construction of 1250 miles of cable system during each of the two years covered by the 1987 Contract. The district court granted the defendants judgment as a matter of law on Count IV on the ground that chapter 671.203 applies only to contracts for the sale of goods, whereas the 1987 Contract was a contract for services.

---

describe above: If the prices quoted in the contract price lists were significantly lower than those prevailing in the market place, JEJ could reject Telesat's offer of work and make a counteroffer, knowing that Telesat would have to pay another contractor a higher price to do the work.

[58]This claim also fails for the reason discussed in part III.A.2, *supra* (lack of consideration), and for the reason discussed in note 49, *supra* (the statute of frauds).

We find no error in the district court's ruling. It is clear that chapter 671.203 applies only to contracts for the sale of goods.[59] *See* Fla. Stat. ch. 671.203 (1997) (imposing obligation of good faith on "[e]very contract or duty *within this code*" (emphasis added)); *see also Florida Mining & Materials Corp. v. Standard Gypsum Corp.,* 550 So.2d 47, 48 (Fla. 2d DCA 1989) ("The Uniform Commercial Code (U.C.C.) governs the sale of goods in Florida."). The 1987 Contract is a contract for the provision of services;[60] the provisions of the U.C.C. are therefore inapplicable. *See Dionne v. Columbus Mills, Inc.,* 311 So.2d 681, 683 (Fla. 2d DCA 1975). We thus affirm the district court's grant of judgment as a matter of law on Count IV.

In addition, as discussed in part III.A, *supra,* there was no valid mileage guarantee to which the good faith requirement could apply. The good faith requirement does not exist "in the air." Rather, it attaches only to the performance of a specific contractual obligation. *See Hospital Corp. of Am. v. Florida Med. Ctr., Inc.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998). Because Telesat had no contractual obligation to offer JEJ 1250 miles of construction work per year, it had no duty to perform such an obligation in good faith.

D. Fraudulent Inducement

---

[59]JEJ alleges in its brief on cross appeal that Count IV was not based on chapter 671.203, but on chapter 672.103. We find no mention of chapter 672.103 in the complaint; even so, it too is part of Article II of the U.C.C. and thus is applicable only to the sale of goods. *See* Fla. Stat. ch. 672.102 (1997) (noting scope of Article II and stating that it "applies to transactions in goods"). JEJ also argues that Count IV was also based on the Florida common law, which it argues, implies a covenant of good faith into every Florida contract. Not only did JEJ not plead Count IV under a common law theory, but even if it had, judgment as a matter of law would have been appropriate because, as discussed in part III.A, *supra* (and in the next paragraph), the parties did not enter into an enforceable contract into which a covenant of good faith could be implied.

[60]Although the 1987 Contract contemplated the sale of some goods to JEJ (e.g., materials), such sales were incidental to the primary purpose of the contract—the provision of cable installation services.

The district court granted judgment as a matter of law on Count VIII, "Alternate Claim for Fraud in the Inducement," on two grounds. First, the court applied the standard for admitting evidence under the "inducement" exception to the parol evidence rule, imposing the requirement that JEJ's evidence of fraudulent inducement be "clear, precise, and indubitable," and concluded that JEJ's evidence did not satisfy this requirement. Second, stating that a plaintiff in a fraudulent inducement action must prove that he suffered injury by acting in justifiable reliance on the defendant's misrepresentation, the district court held as a matter of law that, under the circumstances of this case, it was unreasonable for JEJ to have relied on a mileage guarantee that the 1987 Contract failed to mention.

We find no Florida precedent supporting the court's first ground—that to establish a tort claim for fraudulent inducement, as opposed to a contract claim for breach, the evidence must be "clear, precise, and indubitable."[61] We do find Florida precedent, however, for the district court's second ground.

Florida law defines fraudulent inducement as "[a] false representation of a material fact, made with knowledge of its falsity, to a person ignorant thereof, with intention that it shall be acted

---

[61]The only cases expressing this "clear, precise, and indubitable" standard that we have found are contract cases. Although the cases refer to "fraud," they do so merely in the course of discussing the fraudulent inducement exception to the parol evidence rule. *See F.M.W. Properties, Inc. v. Peoples First Fin. Sav. & Loan Ass'n,* 606 So.2d 372, 374-75 (Fla. 1st DCA 1992); *Venusa Dev. Corp. v. Southeast Mortgage Co.,* 297 So.2d 86, 88 & n. 1 (Fla. 3d DCA 1974). There is an important analytical distinction between a tort action seeking damages for fraudulent inducement to enter into a contract and a breach of contract action where one of the parties seeks to vary or explain the provisions of the contract by introducing parol evidence under the "inducement" exception to the parol evidence rule. *See Ashland Oil, Inc. v. Pickard,* 269 So.2d 714, 722 (Fla. 3d DCA 1972) (noting distinction and stating that parol evidence rule applies "where the controversy is of a contractual nature, but it has no application where the action is in tort for fraudulently inducing a party to enter into the writing").

41

upon, followed by reliance upon and by action thereon amounting to substantial change of position."

*Biscayne Blvd. Properties, Inc. v. Graham,* 65 So.2d 858, 859 (Fla.1953) (quoting *Wheeler v. Baars,* 33 Fla. 696, 15 So. 584 (Fla.1894)). In order to prevail on a fraudulent inducement claim, therefore, the plaintiff must prove the following elements:

(1) a false statement concerning a material fact;

(2) the representor's knowledge that the representation is false;

(3) an intention that the representation induce another to act on it; and,

(4) consequent injury by the party acting in reliance on the representation.

*Johnson v. Davis,* 480 So.2d 625, 627 (Fla.1985). The plaintiff's reliance must be "justifiable." *Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib. Ctr., Inc.,* 513 So.2d 1303, 1306 (Fla. 2d DCA 1987).

As the district court noted in its formal order granting the defendants' Rule 50(a) motions, JEJ's president "participated in the drafting of the [1987 Contract] and had every opportunity to include terms that he considered essential. The parties even made handwritten changes to the agreement on the occasion of its signing. Neither the typed contract nor the written changes said anything about a mileage guarantee." In light of these uncontroverted facts—and in light of the Section 22 merger clause, quoted in part III.A.1, *supra*—we agree that as a matter of law it was unreasonable for JEJ to rely on an alleged oral mileage guarantee that it chose not to reduce to writing. *See Ungerleider v. Gordon,* 936 F.Supp. 915 (M.D.Fla.1996) (applying Florida law and finding reliance on alleged oral promise "perforce unjustifiable" in fraudulent inducement to contract case in which contract had integration clause and alleged oral promise contradicted terms of written contract); *Saunders Leasing Sys., Inc.,* 513 So.2d at 1306 (finding no fraudulent inducement in

42

similar case). We accordingly affirm the district court's grant of judgment as a matter of law as to Count VIII on the court's second ground—lack of justifiable reliance.

We also affirm the district court's decision on a more elementary ground—that JEJ was not fraudulently induced to take "action ... amounting to substantial change of position." *See Biscayne Blvd. Properties, Inc. v. Graham,* 65 So.2d 858, 859 (Fla.1953) (quoting *Wheeler v. Baars,* 33 Fla. 696, 15 So. 584 (Fla.1894)). In other words, JEJ did not "act[ ] to [its] injury." *Huffstetler v. Our Home Life Ins. Co.,* 67 Fla. 324, 65 So. 1, 2 (Fla.1914); *see also* 27 Fla.Jur. 2d § 49, at 336-37 (1981) (noting that the "person to whom the representation is made must have relied on it and, as a consequence, been induced to act to his detriment" (footnotes omitted)).[62]

JEJ argues that it suffered injury when Telesat fraudulently induced it to change its position and sign the 1987 Contract. The 1987 Contract, however, did not require Telesat to build any cable systems. And it did not require JEJ to do anything. Instead, it expressly granted JEJ the right to decline Telesat's offers of work at its whim. JEJ's claim is thus reduced to the allegation that it was fraudulently induced to sign a contract that did not bind it to perform any work for Telesat.[63] The law's requirement that the plaintiff take "action ... amounting to substantial change of position" is accordingly absent.[64]

E. RICO

---

[62]The district court did not base its decision on this ground. We nonetheless consider it under our authority to affirm a district court's judgment on a ground not relied on by the court. *See supra* note 50.

[63]We note again that this contract was drafted almost exclusively by JEJ's attorney. *See supra* Part I.C.

[64]We also affirm the district court's decision on the basis of the Florida statute of frauds. *See supra* note 49; *see also Ashland Oil, Inc. v. Pickard,* 269 So.2d 714 (Fla. 3d DCA 1972).

In this section, we address JEJ's contention that the district court erred in granting the defendants' motions for judgment as a matter of law on Counts I and II, the federal and Florida RICO claims.[65]

1.

Section 1962 of Title 18 of the United States Code criminalizes the following activities:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from *a pattern of racketeering activity* ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through *a pattern of racketeering activity* ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

---

[65]JEJ alleged that the defendants, in violation of 18 U.S.C. § 1962(a)-(d), carried out a pattern of racketeering activity by engaging in a mail and wire fraud scheme. The scheme had two parts. The first involved the defendants' misrepresentations to franchising authorities for the purpose of obtaining cable franchises for Telesat. The second involved misrepresentations to JEJ for the purpose of inducing it to do business with Telesat. As for the first part, the district court ruled *in limine* that the misrepresentations to franchising authorities were barred by the *Noerr-Pennington* doctrine. Under that doctrine, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *see also McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1558 (11th Cir.1992). Finding this case sufficiently analogous to the antitrust context in which the doctrine arose, the district court applied the doctrine and prohibited JEJ from using the defendants' petitioning of franchising authorities as predicate mail and wire fraud acts, thus striking from Count I the first part of the alleged scheme to defraud. Because, as we discuss *infra,* JEJ's Count I claim fails on other grounds, we need not consider JEJ's argument that the district court improperly applied the *Noerr-Pennington* doctrine. As for the second part of the alleged scheme, the district court held that JEJ's failure to make out a case of fraudulent inducement under Count VII foreclosed the use of that part as support for the Count I claim. Accordingly, because Count I alleged no other acts of racketeering, the defendants were entitled to judgment as a matter of law.

Because the Count II Florida RICO claim mirrored the federal RICO claim, the court granted a Rule 50(a) judgment on Count II as well.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through *a pattern of racketeering activity.*

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(a)-(d) (1994) (emphasis added). All four subsections of section 1962 thus require proof of a "pattern of racketeering activity," which is defined in 18 U.S.C. § 1961(5) as "at least two acts of racketeering activity." The definition of racketeering activity includes "any act which is indictable" under a number of federal criminal statutes. Among these statutes are 18 U.S.C. § 1341, the federal mail fraud statute, and 18 U.S.C. § 1343, the federal wire fraud statute. *See* 18 U.S.C. § 1961(1) (Supp. II 1996). Mail fraud or wire fraud "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Pelletier v. Zweifel,* 921 F.2d 1465, 1498 (11th Cir.1991).

Section 1964(c) provides a civil remedy to persons injured by reason of a violation of section 1962:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C.A. § 1964(c) (Supp. II 1998). To prevail under section 1964(c), the plaintiff must prove both a violation of section 1962(a), (b), (c) or (d), and that the plaintiff was injured "by reason of" that violation.

JEJ alleges that in executing their greenmail scheme, the defendants violated all four subsections of section 1962. The notion that one or more of the defendants violated subsections (a) or (b) is frivolous. As for (a), assuming that one or more of the defendants engaged in a pattern of

45

racketeering activity as alleged, JEJ has presented no evidence from which a reasonable jury could find that such defendant(s) "received income from [such] activity and used that income in the operation of the enterprise," i.e., Telesat.[66]  As for (b), indulging the same assumption, we find no evidence that any of the defendants "acquired or maintained, directly or indirectly, an interest in or control of [Telesat] through a pattern of racketeering activity."

With respect to subsection (c), however, a reasonable jury could find that Group or Capital, as "person[s] ... associated with [Telesat,] conduct[ed] and participate[d], directly or indirectly, in the conduct of" the affairs of Telesat.  With respect to subsection (d), a reasonable jury could find that the defendants conspired to violate subsection (c).  As to those two subsections, therefore, the sufficiency of JEJ's case under Count I turns on whether the defendants committed two or more predicate acts of mail or wire fraud that injured JEJ in its "business or property."

Count I alleges that the defendants committed the following fraudulent acts (each facilitated by the use of the mails or wires), and thus engaged in a pattern of racketeering activity:

> (a) Fraudulently misrepresenting [Telesat's, Group's, and Capital's] present intentions concerning cable construction schedules when, in truth and in fact, [they] had no intention to complete the construction schedules as represented;

> (b) On more than two occasions, fraudulently inducing [JEJ] to agree to continue construction services in franchise areas when, in fact, [they] had already decided to sell their operations in those respective areas;

> (c) Misrepresenting their intentions concerning construction and business plans to various franchising authorities and refusing to reveal their true intentions;

---

[66]JEJ has alleged that Telesat is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and thus participation therein creates potential RICO liability under 18 U.S.C. § 1962.  We have held that, for RICO purposes, a single entity can be both the defendant and the "enterprise" in which the defendant participated. *See Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1398 (11th Cir.1994).

46

(d) Instructing [Telesat's] employees to fail to process invoices in a timely fashion in order to obtain leverage against [JEJ];  and

(e) Failing to pay [JEJ] monies due and owing, in an attempt to extort a release from [JEJ].

The misrepresentations set out in (c) were made to the franchising authorities, and the misrepresentations alleged in (a) may have been made to them as well.  The conduct alleged in (a), (b), (d), and (e) was directed toward JEJ.[67]

We consider first the misrepresentations made to franchising authorities.  We are unable to understand how these misrepresentations injured JEJ in any way.  If anything, the misrepresentations inured to JEJ's benefit.  By encouraging the approval of Telesat's franchise applications, they allowed Telesat to build more cable systems and, thus, to offer JEJ more construction work.  But for the defendants' scheme, Telesat would have had no work to offer.  If Telesat's intent was to overbuild the existing cable system until the incumbent cable operator agreed to participate in a joint venture or to purchase Telesat's franchise (in which case the overbuild, and JEJ's construction work, would cease), Telesat would have to pay JEJ for the work already performed and the profits JEJ would have made had it been allowed to complete the job.

Putting this point aside, even if we were to assume that JEJ suffered injury as a result of the misrepresentations made to the franchising authorities, JEJ did not suffer a *direct* injury, proximately caused by those acts, as required under section 1964(c).  *See* 18 U.S.C. § 1964(c) (requiring that plaintiff be "injured ... by reason of" a violation of section 1962).  As we have explained:

> [A] plaintiff has standing to sue under section 1964(c) only if his injury flowed directly from the commission of the predicate acts....  This means that, when the alleged predicate act is

---

[67]Because act (a) may be read as directed either toward the franchising authorities or toward JEJ, we read act (a) as directed toward both.

47

mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.

*Pelletier v. Zweifel,* 921 F.2d 1465, 1499-1500 (11th Cir.1991), *see also Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266-68, 112 S.Ct. 1311, 1317-18, 117 L.Ed.2d 532 (1992) (imposing proximate rather than factual cause requirement in holding that to bring civil RICO claim under section 1964(c) plaintiff must have suffered direct injury as a result of defendant's violation of section 1962). Because the misrepresentations the defendants are said to have made were directed to the franchising authorities, not JEJ, JEJ lacks standing under section 1964(c) to prosecute a claim based on such misrepresentations.

JEJ does have standing, however, to prosecute a claim based on defendants' conduct that was directed toward it, as alleged in paragraphs (a), (b), (d), and (e). In (a), JEJ alleged that the defendants fraudulently misrepresented their present intentions about Telesat's construction schedules. More specifically, the defendants did not intend that Telesat would abide by the schedules it established for the construction work JEJ was to perform; in truth, they fully anticipated that these schedules would not be completed (because Telesat would reach a deal with the incumbent cable operator and dispense with its overbuild). In (b), JEJ alleged that the defendants induced it to continue working in a particular franchise area even though Telesat had already decided to shut the job down and enter into a joint venture with the incumbent operator.

We fail to see, however, how JEJ could have suffered any injury as a result of the conduct described in paragraphs (a) or (b). Under the protocol the parties adopted and followed, after Telesat acquired a franchise and prepared the construction plans and specifications, it would issue an offer in the form of a "Notice to Proceed." If JEJ accepted the offer, thus creating a contract, it would

48

commence construction. If Telesat cut the job short, JEJ would be entitled to payment for work it had done, as well as for the profits it would have made had it completed the job.

Paragraphs (d) and (e), describing Telesat's undue delay in paying JEJ's invoices, alleged nothing more than breach of contract. This is so notwithstanding the allegation that Telesat delayed paying the invoices in order to extort a release from JEJ of its claims (other than those evidenced by the invoices) against Telesat. Even if we were to assume that Telesat delayed paying JEJ's invoices for an extortionate purpose, Telesat's conduct would not constitute a "scheme to defraud" proscribed by the mail and wire fraud statutes; thus, the acts of nonpayment could not serve as acts of racketeering. *See United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980) (explaining that the mail fraud statute "does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract");[68] *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990) (stating, with reference to mail and wire fraud statutes, "[n]or does a breach of contract in itself constitute a scheme to defraud").

For the foregoing reasons, we affirm the district court's judgment for the defendants as a matter of law on JEJ's federal RICO claim.

2.

As indicated in part II.A, *supra,* JEJ's Florida RICO claim essentially replicated the allegations of its Count I federal RICO claim; the acts cited in Count II as constituting a "pattern of racketeering activity" were the same fraudulent acts cited in Count I. Count II, however, sought both legal and equitable relief. Nevertheless, in briefing its cross-appeal, JEJ has not challenged the

---

[68]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

district court's rejection of its claim that the criminal RICO statute entitled it to equitable relief. It challenges, instead, the district court's decision granting the defendants' Rule 50(a) motion for judgement as a matter of law on its treble damages claim under the civil RICO statute.

The civil RICO statute is modeled on federal RICO's private civil remedy provision, 18 U.S.C. § 1964(c). It provides that:

> Any person who proves by clear and convincing evidence that he or she has been injured by reason of any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

Fla. Stat. ch. 772.104 (1997). Chapter 772.103 makes it unlawful for any person:

> (1) Who has with criminal intent received any proceeds derived, directly or indirectly, from *a pattern of criminal activity* ... to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any ... interest ... in the establishment or operation of any enterprise.
>
> (2) Through *a pattern of criminal activity* ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise....
>
> (3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through *a pattern of criminal activity* ....
>
> (4) To conspire ... to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

Fla. Stat. ch. 772.103 (1997) (emphasis added). A "pattern of criminal activity" is defined in chapter 772.102(4) as:

> at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents....

50

Fla. Stat. ch. 772.102(4) (1997). Included in the definition of criminal activity is any conduct that is "subject to indictment or information as a criminal offense and listed in [the federal RICO statute,] 18 U.S.C. § 1961(1)(A), (B), (C), or (D)." Such conduct includes, of course, mail and wire fraud.

Reduced to its essentials, Count II seeks relief on the basis of the same mail and wire fraud allegations as Count I presented. Perceiving no reason for applying a different rationale to Count II than the one we applied in rejecting Count I, we affirm the district court's decision granting judgment as a matter of law for the reasons we have affirmed its judgment on Count I.

F. Claims against Capital

The district court granted Capital judgment as a matter of law on all counts because it concluded that JEJ failed to produce any evidence of independent wrongdoing on the part of Capital. In its brief on cross appeal, JEJ takes issue with the district court's conclusion, arguing that a reasonable jury could have found wrongdoing on the part of Capital from the evidence before it. In support of its argument, JEJ cites evidence demonstrating that: Capital was Telesat's parent; Capital financed the construction of Telesat's cable systems;[69] Capital's financial commitment to Telesat gave credibility to Telesat's franchise applications; and Capital was controlled by persons who were officers of Telesat, Group, or both.

The evidence JEJ cites merely demonstrated that Capital provided its wholly-owned subsidiary with funding and, as prudence would require, thereafter monitored its subsidiary's use of

---

[69]The form of the investment—whether it was by equity investment, loan, or independent guarantee of Telesat obligations—is not known.

51

the funds. Capital's conduct could hardly be labeled "wrongful."[70] The district court's decision granting Capital judgment as a matter of law is accordingly affirmed.

IV.

Group appeals the judgment against it for breach of contract and tortious interference with contractual relations. We find that the evidence was insufficient to support either verdict, and thus reverse the judgment against Group in its entirety.

A. Breach of Contract

The jury found that Group was operating Telesat as "a mere instrumentality" for its own illegal purposes, and thus held Group jointly liable with Telesat for breach of contract under the "piercing the corporate veil" doctrine. The Florida Supreme Court has spoken to the issue of when the corporate veil should be pierced as follows:

> Corporations are legal entities by fiction of law. Their purpose is generally to limit liability and serve a business convenience. Courts are reluctant to pierce the corporate veil and only in exceptional cases will they do so. Such instances are for fraud as where creditors are misled and defrauded or where the corporation is created for some illegal purpose or to commit an illegal act.

*State ex rel. Continental Distilling Sales Co. v. Vocelle,* 158 Fla. 100, 27 So.2d 728, 729 (Fla.1946). A party seeking to pierce the corporate veil and hold a parent corporation liable for the actions of its subsidiary must prove: (1) that the subsidiary was a "mere instrumentality" of the parent, *and* (2) that the parent engaged in "improper conduct" through its organization or use of the subsidiary. *See Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1117-21 (Fla.1984). Improper conduct

---

[70]As the district court stated in an order ruling on the parties' post-trial motions: "The defect in JEJ's case against [Capital] was that JEJ attempted to rely almost entirely on evidence against [Group] to implicate [Capital] in wrongdoing.... In order to build a proper case against [Capital] [JEJ] would have needed to place greater focus on actions taken by [Capital]."

is present only in " "cases in which the corporation was a mere device or sham to accomplish some ulterior purpose ... or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.' " *Id.* at 1117 (quoting *Mayer v. Eastwood, Smith & Co.,* 122 Fla. 34, 164 So. 684, 687 (Fla.1935)).

Applying these principles, we conclude that JEJ failed to make out a case for the jury on its claim that Group should be held liable for Telesat's actions. Even if we were to assume that Telesat was a "mere instrumentality" of Group, there is simply no evidence that Group used Telesat for the purpose of engaging in improper conduct. The relationship between Group and Telesat was essentially that of a normal parent and subsidiary with no misuse of the corporate form.[71] JEJ introduced no testimony indicating that it was deceived or misled as to the independent identities of the two corporations or that it believed that it had entered into a contractual relationship with Group.

JEJ contends that Group engaged in "generalized improper conduct," and that such conduct provided ample grounds for piercing the corporate veil. As it did in its closing argument to the jury, JEJ argues that Group used Telesat to carry out an elaborate greenmail scheme: Group "used Telesat to trick franchise authorities and competitors" knowing that "it would reap millions in profits." As the trial judge correctly ruled *in limine,* there was nothing unlawful about Telesat's franchising activity. Moreover, Congress, in deregulating rates under the Cable Act, intended that cable companies such as Telesat would apply for franchises in areas with incumbent cable operators;

---

[71]Although Capital was Telesat's parent, for purposes of this discussion we assume that Group was Telesat's parent, because Group owned Telesat's sole shareholder, Capital. Because we hold that, even under this assumption, JEJ cannot "pierce" to Group, we do not need to address whether JEJ would otherwise have needed to pierce to Capital before piercing to Group.

indeed, one of the very purposes of the Cable Act was to induce competition in the cable industry. Congress certainly understood the business reality that incumbent cable operators, in an effort to protect their monopolies and the profits that rate deregulation could provide, might attempt to buy out newcomers such as Telesat rather than compete. Group did nothing more than accept Congress' invitation to enter into competition with the incumbents. We are at a loss to understand how that could constitute "greenmail" or anything that the law would consider improper.

We find nothing in the record that could be said to constitute the sort of conduct that would warrant piercing the corporate veil. We therefore conclude that the district court erred in refusing to grant Group judgment as a matter of law on JEJ's breach of contract claims.

B. Tortious Interference with Contract

Group also contends that the evidence was insufficient to make out a case for the jury on JEJ's "Alternative Claim for Tortious Interference with Contractual Relations."[72] Under Florida law, the elements of a cause of action for tortious interference with a contractual relationship are:

(1) The existence of a contract,

(2) The defendant's knowledge of the contract,

(3) The defendant's intentional procurement of the contract's breach,

(4) Absence of any justification or privilege, [and]

---

[72]In renewing its Rule 50(b) motion for judgment as a matter of law following trial, Group argued that it was entitled to judgment as a matter of law on this tortious interference claim because the jury could not pierce the corporate veil to find Group liable for Telesat's breach of the 1987 Contract and then also find Group liable for tortiously interfering with the same contract. The district court rejected Group's argument, and Group has reiterated the argument on appeal. Because in part IV.A, *supra,* we conclude that the evidence was insufficient to support piercing the corporate veil and holding Group liable for breach of the 1987 Contract, the issue of simultaneous liability is no longer before us.

(5) Damages resulting from the breach.

*Florida Tel. Corp. v. Essig,* 468 So.2d 543, 544 (Fla. 5th DCA 1985). Group concedes that JEJ established the first two elements, and, given the circumstantial evidence in the record,[73] we conclude that JEJ established the third element. As for the fourth element, however, the absence of any justification or privilege, JEJ's case fails as a matter of law.

Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged. *See Ethyl Corp. v. Balter,* 386 So.2d 1220, 1225 (Fla. 3d DCA 1980); *Babson Bros. Co. v. Allison,* 337 So.2d 848, 850 (Fla. 1st DCA 1976). Group, as the owner of Telesat's sole shareholder, Capital, had the requisite financial interest in Telesat's business to invoke the privilege. *See Babson Bros. Co.,* 337 So.2d at 850 ("It is clear that a controlling stockholder of a corporation falls within the privilege when he interferes with a contract between the corporation and a third person.").[74] Furthermore, JEJ presented no evidence that Group employed improper means in protecting this interest.

JEJ contends that Group's actions were not privileged because they were motivated by a malicious intent "to retaliate against Johnson for complaining about the lack of mileage and becoming wise to the greenmail scheme." Whether Group acted with malice is of no moment;

---

[73]That evidence indicated that Group, through its ownership of Capital, Telesat's sole shareholder, closely monitored Telesat's cable system construction, including the work JEJ was doing for the company. In addition, Telesat informed Group (1) that JEJ's construction work was substandard, (2) that JEJ was constantly complaining about not having enough work, (3) that JEJ was threatening to bring suit because Telesat had not lived up to the alleged mileage guarantee (which Telesat denied having made), and (4) that Telesat was considering canceling the 1987 Contract.

[74]Group's ownership interest in Telesat distinguishes this case from *Yoder v. Shell Oil Co.,* 405 So.2d 743, 744 (Fla. 2d DCA 1981), in which the court stated that "a privilege to interfere with a third party's conduct does not include the purposeful causing of a breach of contract."

under Florida law, its actions were privileged.  As one Florida appellate court has observed, "it is irrelevant whether the person who takes authorized steps to protect his own interests does so while also harboring some personal malice or ill-will towards the plaintiff...."  *See Ethyl Corp.,* 386 So.2d at 1225;  *see also Menendez v. Beech Acceptance Corp.,* 521 So.2d 178, 180 (Fla. 3d DCA 1988) (discussing financial interest privilege and stating that "conduct engaged in for legitimate purposes, even if tinged with animosity and malice, does not give rise to a cause of action for interference with a contractual relationship").

In sum, we conclude that the evidence was insufficient to establish a case of tortious interference.[75]  Accordingly, Group was entitled to the entry of judgment as a matter of law on this claim.[76]

V.

Telesat appeals the judgment against it on Count III, "Breach of Contract."  Count III, as pled in the complaint, contained two independent causes of action.  The first was based on the mileage guarantee;  the second was based on the invoices JEJ had submitted to Telesat for work done prior to Telesat's termination of the 1987 Contract.  As noted in part II.B, *supra,* after striking the mileage guarantee from the case at the close of the evidence, the district court, without objection, allowed

_____

[75]The jury found Group liable for $1.5 million in compensatory damages (based on the alleged damages to JEJ from Telesat's breach of the 1987 Contract) and $4 million in punitive damages.  Because we have held that Group is not liable for breach of contract, *see supra* part IV.A, we would necessarily have to vacate the compensatory portion of the award for tortious interference.  This raises the question of whether punitive damages for tortious interference can be awarded in the absence of compensatory damages.  This is, however, a question we need not answer in light of our disposition of the tortious interference claim.

[76]The tortious interference claim was Count XIII of the initial complaint and Count XI of the amended complaint.  *See supra* note 23.

JEJ to substitute for its claim based on the mileage guarantee a new claim that did not appear in the complaint. This minted-on-the-spot claim was for the profits JEJ would have made had it been given the construction work Telesat awarded to other contractors after it terminated the contract (the "Substituted Claim"). Following this substitution, the district court and the parties treated Count III as if it contained two claims: the Substituted Claim, and a claim for the sums due on invoices that JEJ had submitted to Telesat and remained unpaid (the "Unpaid Invoices Claim").

A. The Substituted Claim

Telesat contends that it is entitled to judgment as a matter of law on the Substituted Claim on two grounds. The first ground goes to the issue of liability: Telesat contends that JEJ failed to fulfill its contract obligations in performing one or more cable construction jobs and thereby gave it just cause to terminate the 1987 Contract. The second ground involves the issue of damages: Telesat contends that the evidence JEJ adduced to establish the profits it would have made on the jobs Telesat gave to other contractors after April 13, 1989, was speculative. We consider these contentions in order.

1.

In its answer to JEJ's complaint, Telesat alleged that JEJ breached the 1987 Contract in several respects,[77] and that because these breaches continued for more than thirty days, it had the

---

[77]Because JEJ had no obligations under the 1987 Contract, *see supra* part III.A.2, JEJ could not breach that contract. Telesat, however, alleged in effect that JEJ breached the 1987 Contract by breaching various construction contracts the parties entered into after signing the 1987 Contract. These later contracts were treated by the parties as having incorporated the provisions of the 1987 Contract by reference. Without identifying any of these later construction contracts, except the August 1988 contract to rebuild the underground cable lines at the Pines as described in part I.D., *supra,* Telesat described JEJ's breaches as follows: JEJ (1) failed to restore the sprinkler system at the Pines at no cost to Telesat; (2) failed to perform its work in a good and workmanlike manner; (3) failed to keep construction sites free of debris and in a safe condition;

right to terminate the contract pursuant to Section 12 of the agreement. JEJ, in response, denied breaching the 1987 Contract in the manner Telesat alleged. JEJ also contended that, even if it breached the contract, Telesat waived the alleged breaches by failing to give JEJ proper notice of the deficiencies in its job performance and an opportunity to cure them, and by having previously accepted performance that failed to meet contractual requirements.

At trial, JEJ and Telesat introduced conflicting testimony in support of their respective positions, thereby creating several issues of fact. In the face of the parties' "swearing match," we cannot say that the evidence was insufficient as a matter of law to support the jury's finding that Telesat breached the 1987 Contract; hence, we affirm the district court's refusal to withdraw JEJ's Substituted Claim from the jury.

2.

At trial, JEJ's strategy was to demonstrate, and claim, the profits it would have made had Telesat awarded it contracts for the construction of 1250 miles of cable system in 1988 and again in 1989. Because JEJ had received contracts for the construction of 648 miles of cable system during those years, its proof of lost profits centered on the profits the company would have earned had Telesat awarded it contracts for the balance of the 2500 miles of cable system, or 1852 miles.

At the close of the evidence, the district court struck the mileage guarantee from the case. At that point, JEJ's counsel, desperate for something with which to construct an argument for lost profits, seized upon a piece of information that had been disclosed in the defendants' case in chief. During the defendants' case, the court had asked a question that JEJ's counsel had failed to ask in

---

(4) failed to provide all of the tools, equipment, and personnel necessary to perform the work; (5) failed to perform work within a reasonable time; (6) failed to provide as-built drawings of its work; and (7) failed to hold Telesat harmless for damage JEJ caused on construction sites.

presenting JEJ's case in chief: How many miles of cable system did Telesat build between April 13, 1989, when it terminated the 1987 Contract and ceased giving JEJ work, and November 12, 1989, when the two-year term of that agreement would have ended? Telesat's president answered that Telesat constructed a total of 614 miles in 1989, approximately 300-400 miles of which was built between those two dates. Drawing on this answer and the evidence that JEJ presented in its case in chief to establish the profits the company would have earned had Telesat honored the mileage guarantee, counsel argued to the jury for an award of the profits that would have been generated by the construction of 300-400 miles of cable system.

In their Rule 50(a) motions made at the close of the evidence, the defendants argued that the court should not send JEJ's claim for lost profits to the jury because the record contained no evidence describing the construction work that Telesat had given to other contractors after April 13, 1989.[78] The court disagreed and ruled that, based on the evidence that had been presented, JEJ could estimate effectively the profits that such construction work would have yielded, and present its estimate to the jury in its closing argument. The evidence the court was referring to was the evidence JEJ put on to show the profits it lost because of Telesat's failure to live up to the mileage guarantee. It consisted of the following:

---

[78]Defendants had made this point in their Rule 50(a) motions for judgment as a matter of law made at the close of JEJ's case. They urged the court to dismiss JEJ's Count III claim for lost profits because "there simply are no damages that have been pled that can be recovered.... [T]here is no evidence in this case about how many miles that Telesat built of cable after the date of termination on April 13, 1989, through the end of the contract period on November the 12th or 13th of 1989.... There is no evidence at all of what Telesat did that [JEJ] would be entitled to do under [the 1987] [C]ontract." The district court cured this deficiency in the evidence during the defendants' case in chief when it asked Telesat's president "how many miles [Telesat] built out between April 13th of 1989 and November 13th" of that year, and he said approximately 300-400 miles.

(1) *The testimony of Glenn Johnson.* In preparation for litigation, Johnson directed Terry Maxton, one of JEJ's employees, to compile all of the invoices JEJ had submitted to Telesat from January 1988 to December 1988 for all three of JEJ's divisions (Tampa, Miami, and Orlando); Johnson supplied this information to Harold Farnsworth, a certified public accountant, in the form of an "invoice spreadsheet." Johnson also supplied Farnsworth with information from JEJ's general ledger books and tax returns.

(2) *The testimony of Harold Farnsworth.* Farnsworth testified that:

(a) he had ensured the accuracy of JEJ's invoice spreadsheet by sampling the spreadsheet using a random number generator;

(b) he had calculated the total mileage of aerial and underground construction performed by JEJ for Telesat, by adding up the linear feet indicated on the invoices, and had determined that from November 13, 1987, to April 13, 1989, JEJ constructed a total of 648.22 miles for Telesat: 442.85 in 1988 and 205.37 in 1989;

(c) he had determined that for all the miles of cable system JEJ had built for Telesat, JEJ's average revenue per mile was $11,363.75; in other words, the average price per mile Telesat paid JEJ was $11,363.75;

(d) he defined "gross profit margin" as total revenue minus cost of goods/sales; "gross profit margin percentage" as gross profit margin divided by total revenue;[79] and "net income," or the "bottom line," as gross profit margin minus overhead expenses;

e) using the "invoice spreadsheet" and the cost information JEJ provided him, he had determined JEJ's gross profit margin percentages for work done for Telesat during the period of January 1988 to December 1988. JEJ's gross profit margin percentage in Miami was 24.43% (Farnsworth did not indicate what it was in Tampa and Orlando). If JEJ had constructed 1250 miles of cable system in each year (of the 1987 Contract), instead of the 648 miles it constructed from November 13, 1987 to April 13, 1989, JEJ would have achieved a gross profit margin percentage of 30%; and

(f) after reviewing JEJ's tax returns, he had determined that JEJ's overhead was $943,283 for the year ending January 31, 1988, $1,043,284 for the year ending January 31, 1989, and $815,240 for the year ending January 31, 1990.

---

[79]Thus, multiplying total revenue by the gross profit margin percentage yields gross profit margin. Farnsworth explained, as an example, that if a company's total revenue is $100,000, and its gross profit margin percentage is 24.43%, then the company's gross profit margin is $24,430.

(3) *The testimony of Dr. Fred Raffa, an economist.* Raffa opined regarding the loss of business value and lost profits JEJ sustained because Telesat did not award it contracts for the construction of 1250 miles of cable system during the two-year term of the 1987 Contract. In projecting the lost profits, Raffa used Farnsworth's revenue per mile and overhead figures and a gross profit margin percentage of 25%, because it "split the difference" between the gross profit margin percentage of 30% that JEJ had anticipated making and the gross profit margin percentage of 20% that, according to Farnsworth's calculations, JEJ actually achieved. Raffa stated that JEJ lost "prejudgment interest" on the lost profits, which he calculated at 1% per month (12% per year), the Florida statutory rate.

4) *The testimony of Harry Cushing.* Responding to a question from the trial judge, Cushing, Telesat's president, stated that Telesat constructed 614 miles of cable system in 1989, approximately 300-400 miles of which was constructed between April 13, 1989, and November 13, 1989.

In his closing argument to the jury, JEJ's counsel summarized this evidence in this way:

Mr. Cushing testified that [Telesat] built six hundred miles in 1989. There was a question from the Court. And you heard that [JEJ] built two hundred miles. So that's four hundred miles. And you heard $11,363.75 a mile. And that comes to be $4,545,500. Now you heard about the markup, the joint margin. The 30% number is $1,363,650. And interest is $755,324. For those compensatory damages, if you say 30%, $2,118,974.... If we use 25%, the number is $1,136,375, with interest of $629,570, [which comes to] $1,765,895. That's compensatory damages. That's how much Mr. Johnson would have received if they had not breached ... his contract.

Based on this evidence, the jury awarded JEJ $1,200,000 for the profits it would have earned had it been give the construction work Telesat gave to other contractors between April 13 and November 12, 1989. Telesat and Group contend, as they did in their motions made under Rule 50(a) at the close of the evidence and renewed post-verdict under Rule 50(b), that the evidence was insufficient to support a verdict for lost profits in *any* amount.

Lost profits is, of course, an appropriate measure of damages for breach of contract. *See Poinsettia Dairy Prods., Inc. v. Wessel Co.,* 123 Fla. 120, 166 So. 306, 310 (Fla.1936). In an action for breach of a construction contract, lost profit may be established by showing the total cost that would have been incurred in performing the contract, had the builder been permitted to complete

61

the job, and subtracting that amount from the contract price. *See Ballard v. Krause,* 248 So.2d 233, 234 (Fla. 4th DCA 1971); *see also Robert A. Huggins Gen. Contractor, Inc. v. Willoughby,* 595 So.2d 1003, 1004 (Fla. 5th DCA 1992). The loss, however, "must be proven with a reasonable degree of certainty before it is recoverable. The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." *Shadow Lakes, Inc. v. Cudlipp Constr. & Dev. Co.* 658 So.2d 116, 117 (Fla. 2d DCA 1995) (citations omitted); *see also Marshall Constr., Ltd. v. Coastal Sheet Metal & Roofing, Inc.,* 569 So.2d 845, 847 (Fla. 1st DCA 1990). Applying these principles to the case at hand, we find the evidence of lost profits insufficient to support the jury's damages award of $1,200,000—or any other amount.

To establish the profits it would have earned had it been given the construction work Telesat gave to other cable contractors after terminating the 1987 Contract, JEJ could have introduced into evidence the plans and specifications for such work and evidence of the costs (including overhead) that such work would have entailed.[80] By subtracting the costs from the contract price, JEJ could have established the profits it lost because Telesat gave the work to other contractors.[81]

---

[80]The construction contracts between Telesat and JEJ were not fixed-price contracts, in the sense that they recited a single contract price and bound JEJ to perform the work for that price; nor were they cost-plus contracts, whereby JEJ would be reimbursed for its labor and equipment rental costs and paid a percentage of such costs as overhead and profit. Rather, Telesat paid JEJ in accordance with the price lists attached to the 1986 Contract. Necessarily included in the prices quoted in these lists was an undisclosed figure for JEJ's overhead and profit. Although the contracts contained no fixed price, the parties could estimate what most of the work would cost by consulting the plans and specifications for the job and adding up the units of work—and the prices thereof quoted in Exhibit A—that would be needed to construct the cable system. These units of work, however, did not include compensation for all of the equipment or the supplemental personnel that might be needed at the job site; estimating the cost of these items, by consulting the hourly rates quoted in Exhibit B, would be problematic.

[81]Because it is clear that JEJ could have established its lost profits with reasonable certainty, it could not have sought comfort under the Florida rule that "uncertainty as to the amount of

62

JEJ eschewed such proof, however, and chose instead to rely on the expert opinion testimony it had presented to show the profits it would have earned had Telesat fulfilled its mileage promise. Drawing on that testimony, JEJ asked the jury to multiply the approximately 400 miles of cable system Telesat had constructed post-termination by the $11,363.75 revenue-per-mile figure (arrived at by Farnsworth), then to multiply that number by either a 30% (JEJ's figure) or 25% (Dr. Raffa's "split the difference" figure) gross profit margin percentage, and finally to add to the resulting figure a sum for prejudgment interest.

At the outset, there are three obvious reasons why this evidence was insufficient to make out a case for the jury. First, it is unreasonable to think that in constructing an additional 400 miles from April 13 to November 13, 1989, JEJ would not have incurred some overhead costs beyond those it had incurred prior to April 13, 1989. Second, both the 30% and the 25% gross profit margin percentages were inherently speculative; as Dr. Raffa testified, neither were actual figures. Relying on Farnsworth's calculations, Dr. Raffa testified that the average gross profit margin percentage achieved by JEJ was 20%. Third, even this 20% figure was speculative. Farnsworth testified that he calculated JEJ's average gross profit margin percentages for work done for Telesat during the isolated twelve month period from January to December 1988; as he acknowledged, his calculations might have yielded different gross profit margin percentages had he used, for example, a different twelve-month time period or had he used the seventeen-month period following the signing of the 1987 Contract when JEJ was doing construction work for Telesat.

---

damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong. Inability to give the exact or precise amount of damages does not preclude recovery." *Conner v. Atlas Aircraft Corp.,* 310 So.2d 352, 354 (Fla. 3d DCA 1975) (footnote omitted).

JEJ argues that determining lost profits based on past performance under a contract is acceptable under Florida law.[82] Even if we were to assume that JEJ established that the work it performed for Telesat after November 13, 1987, (when the 1987 Contract was signed) yielded an average profit of $11,363.75 per mile, the evidence was insufficient to warrant submission of the lost profits issue to the jury, because there was no way of knowing whether the jobs given to other contractors after April 13, 1989 (when Telesat terminated the parties' contractual relationship), were sufficiently similar—for the purpose of profits comparison—to jobs JEJ performed between November 13, 1987, and that date. To sustain a lost profit damages award based on such a profit comparison, we would have to assume that Telesat's post-termination contracts with other contractors were similar to its pre-termination contracts with JEJ.

Also, since the 1987 Contract did not require JEJ to perform any construction work for Telesat, in order to sustain a damages award for lost profits based on such a profit comparison we would have to assume that JEJ would have accepted—and would have been in the financial position to accept—the 300-400 miles of construction work that Telesat gave to other contractors. This is no small assumption given the suggestion in the record that JEJ had a history of financial losses.[83]

_____

[82]For this proposition JEJ cites *Travelers Insurance Co. v. Wells,* 633 So.2d 457, 462-63 (Fla. 5th DCA 1993), in which a saw mill sued its insurance agent for breach of contract for wrongfully failing to renew its workers compensation policy; the saw mill recovered the profits it lost as a result of having to cease its business operations. *Wells* is inapposite because, contrary to the situation in the instant case, the *actual* lost profits would have been impossible to prove.

[83]Dr. Raffa testified, based on an analysis of JEJ's tax returns from 1984-87, that JEJ had suffered losses of about $100,000 per year. *See Forest's Mens Shop v. Schmidt,* 536 So.2d 334, 336-37 (Fla. 4th DCA 1988) (stating that a condition precedent to the recovery of lost profits damages is "proof, by competent evidence, that the business had earned profits for a reasonable time before the occurrence of the wrong complained of" and finding the evidence insufficient to support the jury's lost profits damage award given that the evidence was based on anticipated gross profits and ignored expenses and the business' "history of losses").

We accordingly find the evidence insufficient to support any award for lost profits, much less the jury's $1,200,000 award. However, in light of our finding in part IV.A.1, *supra,* that the evidence was sufficient to uphold the jury's finding of breach of contract, we remand for the award of nominal damages. Under Florida law, as Telesat acknowledges, when a breach of contract has been established and "there is insufficient evidence presented to ascertain the particular amount of loss, the award of nominal damages is proper." *Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954, 956 (Fla. 3d DCA 1979). Accordingly, in vacating the judgment granting JEJ $1,200,000 against Telesat, we instruct the district court, on receipt of our mandate, to enter judgment for JEJ against Telesat for nominal damages, in a sum not to exceed one dollar. *See Forest's Mens Shop v. Schmidt,* 536 So.2d 334, 337 (Fla. 4th DCA 1988).

B. Sufficiency of Evidence Supporting Jury Award for Unpaid Invoices

Telesat contends that the district court erred in submitting the Unpaid Invoices Claim to the jury because the evidence was insufficient as a matter of law to support any award on that claim, much less the $300,000 award the jury returned. At trial, Telesat admitted that $101,987.16 worth of JEJ invoices remained unpaid. Telesat contended, however, that the undisputed evidence showed that Telesat's setoffs against JEJ's invoices exceeded that sum, and therefore that the court should have stricken the Unpaid Invoices Claim from the case. We agree.

At trial, JEJ offered nothing, save the bald conclusion of Glenn Johnson, in support of its Unpaid Invoices Claim.[84] Thus, in addressing the jury at the close of the trial, JEJ did not ask the

---

[84]At trial, Glenn Johnson testified that as of the date the 1987 Contract was terminated, Telesat owed JEJ approximately $997,000. This amount is not corroborated by any of the documentary evidence presented to the jury. This $997,000 figure is also inconsistent with Johnson's trial testimony that after JEJ was paid $775,603.65 on May 26 and $97,993.84 on August 16, approximately $100,000 in invoices remained unpaid. (Subtracting $775,603.65 and

jury—in either its closing argument or its rebuttal to Telesat's closing argument—to include in its verdict a sum for unpaid invoices.[85] Moreover, after Telesat's counsel reminded the jury that JEJ, in its opening argument, had effectively abandoned the unpaid invoices aspect of its breach of contract claim, JEJ had absolutely no response. In fact, JEJ said nothing in support of its Unpaid Invoices Claim until it filed a response to Telesat's post-trial Rule 50(b) motion for judgment as a matter of law.

In that response, JEJ acknowledged that it "cannot identify the precise elements of damaged [sic] relied upon by the jury" in awarding JEJ $300,000 on its Unpaid Invoices Claim. Nonetheless, JEJ argued that there was an adequate basis in the record to support the award. It pointed to evidence indicating that Telesat paid JEJ's invoices promptly before it terminated the 1987 Contract but not afterward, that Telesat lacked an excuse for failing to pay some of the invoices, that JEJ's financial condition deteriorated, and that JEJ's relationship with its bank soured after Telesat

---

$97,993.84 from Johnson's uncorroborated $997,000 figure leaves $123,402.51, not $100,000, the sum due from Telesat according to Johnson's trial testimony.) For these reasons, Johnson's uncorroborated trial statement that JEJ was owed $997,000 in unpaid invoices appears to lack probative value; thus, we have not used the figure in calculating the amount of the unpaid invoices established by the evidence.

> On appeal, JEJ argues for the first time that JEJ's 1989 internal balance sheet listing $101,689.27 in accounts receivable for work performed by JEJ for Telesat constitutes an "invoice." We disagree. At the trial, JEJ never pointed to this exhibit as evidence of the amount of invoices that remained unpaid; moreover, a balance sheet is not an invoice and does not constitute proof that Telesat owed JEJ anything on the invoices it had submitted for work performed.

[85]JEJ argued that it was not liable for damages to the Pines, that the jury could not find credible Telesat's witnesses who testified as to amounts JEJ owed Telesat in offsets, and that Telesat had delayed payment on undisputed invoices, JEJ made no argument, however, specifically asking for sums due on unpaid invoices.

terminated the contract. We are at a loss to understand how such evidence could be said to support the jury's finding that Telesat owed JEJ $300,000 for unpaid invoices.

While JEJ made no attempt to document the invoices Telesat had not honored, Telesat introduced records, and considerable explanatory testimony, showing the amount of the invoices it had not paid and the sums it was entitled to set off against such amount. Telesat's evidence demonstrated the following: (1) As of the contract termination date, April 13, 1989, Telesat owed JEJ $975,584 for work performed on various jobs; of this amount, Telesat had received invoices for $614,789 before April 14, 1989, and invoices for an additional $360,795 after that date; (2) on May 26, 1989, Telesat paid JEJ $775,603.65; on August 16, 1989, it paid JEJ $97,993.84. Subtracting these payments from $975,584 leaves $101,987.16 as the amount of the invoices that Telesat had not paid.

Telesat established setoffs against this sum in the form of costs incurred in taking care of matters for which JEJ was responsible: repairing damage and performing restoration. As Glenn Johnson explained, the difference between the amount Telesat owed and the amount Telesat paid was "for things that were attributable to [JEJ] to finishing projects in the field that we had not finished, and things like rounding up cable reels. A lot of this stuff is what we would do in our normal everyday construction, that we would have finished without any problem." Telesat's setoffs totaled $111,000, and, because they exceeded the amount of the unpaid invoices; $101,987.16, reduced the amount due JEJ to zero. The evidence Telesat introduced, without objection, to establish its setoffs included:

> (1) A book that included a detailed summary of the direct expenses—with corresponding invoices from third parties—Telesat incurred that were attributable to JEJ. These expenses totaled $90,000;

(2) The testimony of Doug Grace, Telesat's Director of Engineering, who was responsible for determining the amounts actually due on JEJ's invoices after April 13, 1989. Grace stated that at the time of trial, two cable companies had an outstanding claim against Telesat for the damage JEJ's construction crews caused to their cable lines. Glenn Johnson admitted that JEJ had agreed to pay half of a $50,000 settlement with these two companies, and that JEJ had paid $4,000 of that amount. Subtracting $4,000 from $25,000 (half of $50,000) leaves $21,000 as the amount JEJ owed Telesat for its portion of the settlement.[86]

With the exception of $19,699.50 that Telesat paid to the Pines for the repairs to its sprinkler system (a sum included in the direct expenses referred to in (1) above), JEJ did not dispute the amount of Telesat's setoffs to any meaningful degree. In fact, Glenn Johnson testified, consistent with his pre-trial deposition testimony, that "[t]here is not a lot of disagreement" about the setoffs.

As for JEJ's argument that the $19,699.50 Telesat paid to the Pines should not have been charged as a setoff, we conclude that the district court should have included this amount in computing Telesat's setoffs. Although Glenn Johnson denied that JEJ was liable for the damage caused to the Pines sprinkler system, Johnson and a representative of his insurance company, American States Insurance Company, both testified that JEJ made a claim—which we assume was not fraudulent—to American States for the damage to the sprinkler system, and that American States had paid JEJ approximately $23,000 on the claim. This figure exceeds the $19,699.50 Telesat paid to the Pines and then subtracted from the amount it owed on JEJ's unpaid invoices. By making this claim against its insurance company, JEJ effectively admitted that its workers had caused the damage to the Pines sprinkler system and that Telesat's setoff was well founded.

---

[86]Although a settlement agreement had not been reached by the time of trial, Grace stated that the other cable companies' claims had escalated to $191,000. Because there was no testimony that JEJ had agreed to split half of this higher amount with Telesat, we only consider the lesser amount of $21,000, which Glenn Johnson acknowledged was due, in examining the evidence of Telesat's setoffs.

Given the absence of a legally significant dispute as to (1) the amount of JEJ's invoices Telesat refused to pay and (2) the amount of Telesat's setoffs, we conclude that the Unpaid Invoices Claim was insufficient as a matter of law. The district court therefore erred in sending the claim to the jury.

VI.

Each of the parties in this case seeks attorneys' fees under at least one contractual or statutory provision, and Telesat and Group seek also to have costs taxed against JEJ. This part addresses those claims.

A. Attorneys' Fees Under Section 35 of the 1987 Contract

Contemporaneous with the filing of their post-verdict motions in this case, both JEJ and Telesat moved the district court to award them attorneys' fees pursuant to Section 35 of the 1987 Contract. JEJ sought fees for all counts except its defamation count, arguing that it was entitled to fees for all work that arose from the same "core factual issues" as the Count III "Breach of Contract" claim on which it prevailed. Telesat sought fees for all counts on which it prevailed at trial. The district court denied both motions; both parties now challenge the court's ruling as to them.

Florida conforms to the "American Rule" under which attorneys' fees are awarded only when permitted by statute or contract. *See Cook v. Deltona Corp.,* 753 F.2d 1552, 1563 (11th Cir.1985). Although there is no statute authorizing attorneys' fees for breach of contract, Section 35 of the 1987 Contract, entitled "Attorney Fees," provided:

> Should it become necessary for either party to bring legal action or engage legal counsel by virtue of any disagreement between the parties of [the 1987 Contract], the prevailing party

69

shall be entitled to receive, in addition to any other amounts, a reasonable sum as and for attorney fees, together with the cost thereby incurred, should it succeed in its actions.[87]

The district court denied JEJ's and Telesat's requests for attorneys' fees under this provision on the ground that each of them had succeeded on parts of the breach of contract claim; thus, neither was "the prevailing party." Because contract interpretation is a question of law, we review the district court's interpretation of the contract and subsequent denial of attorneys' fees *de novo. See Wheat, First Sec., Inc. v. Green,* 993 F.2d 814, 817 (11th Cir.1993); *Zaklama v. Mount Sinai Med. Cent.,* 906 F.2d 650, 652 (11th Cir.1990).

We note at the outset that Section 35 appears to be more expansive than any contractual attorneys' fees provision that has been litigated in the Florida courts; all of the provisions we have found have been limited in scope to disputes arising out of, or connected to, the contract in which the provisions appear. The provision at issue here, however, is not limited on its face to disputes arising out of the 1987 Contract; it extends to "any disagreement between the parties" to the contract. Under Florida law, however, a contract must be interpreted reasonably, based on the parties' intent when they executed the contract. *See James v. Gulf Life Ins. Co.,* 66 So.2d 62, 63

---

[87]In part III.A.2, *supra,* we held that the 1987 Contract was void for lack of consideration. We noted, however, that the provisions of that contract were (in essence) incorporated by reference into subsequent contracts between Telesat and JEJ. *See supra* note 6. Those subsequent contracts were supported by consideration—JEJ agreed to perform construction work for the prices in the price lists. Consequently, because the attorneys' fees provision of the 1987 Contract was incorporated into those subsequent contracts, and because those contracts are integral to this dispute, the parties to those contracts may recover attorneys' fees under the relevant contractual provision.

(Fla.1953). We conclude that the parties most likely intended the attorneys' fee provision to be limited in scope to disagreements arising out of the 1987 Contract.[88]

Having determined the reach of Section 35, we consider which parties may recover attorneys' fees under the provision. One possible interpretation is that it authorizes a plaintiff, but not a defendant, to recover attorneys' fees. Section 35 states that the prevailing party is entitled to attorneys' fees "should it succeed in *its* actions." (emphasis added). Therefore, the provision could be interpreted to authorize recovery of attorneys' fees by a party that prevails on its own claim, but deny recovery of fees by a party that successfully defends against the actions of the other. This construction of Section 35 gives meaning to both "prevailing party" and "should it succeed in its actions." If the phrase "should it succeed in its actions" is interpreted instead to mean that the party must prevail in the lawsuit, then "prevailing party" is excess verbiage.

This interpretation is not reasonable, however, based on the most probable intent of the parties when they signed the 1987 Contract (and the 1986 Contract, which contained the same attorneys' fees provision). The parties are sophisticated businesses and were represented by experienced attorneys. We find it inconceivable that they intended that the party quick enough to initiate a lawsuit would be the only one able to recover attorneys' fees. In fact, neither party espouses this interpretation of Section 35.

Instead, we interpret the section to mean that either a plaintiff or a defendant may recover attorneys' fees for any claim on which it prevails arising out of the 1987 Contract. Only this interpretation provides a reasonable meaning to the phrase "bring legal action or engage legal

---

[88]Arguably, with the exception the defamation claim, all of JEJ's claims arose out of the 1987 Contract.

counsel." While "bring legal action" authorizes a successful plaintiff to recover attorneys' fees, "engage legal counsel" means that a successful defendant may also recover attorneys' fees, even though it did not bring suit.[89]

Telesat has prevailed on all claims except the Substituted Claim in Count III. On that claim, JEJ has prevailed, though its recovery is limited to one dollar. Thus, since each of the parties has succeeded on at least some aspects of JEJ's claims, each is a "prevailing party" within the meaning of section 35. *Cf. Head v. Medford,* 62 F.3d 351, 354 (11th Cir.1995) (stating that a "party need not prevail on all issues" in order to qualify as a prevailing party and receive costs under Fed.R.Civ.P. 54).

Inasmuch as we have altered the landscape against which the district court made its attorneys' fees decisions, the case must be remanded with the instruction that the court revisit the attorneys' fees issues in light of our holdings. On remand, the district court should also take into account the legal expenses incurred on appeal.

B. Attorneys' Fees under Florida civil RICO

All three defendants have appealed the district court's denial of their motions for attorneys' fees under the Florida civil RICO statute. The statute provides that a defendant in an action brought under chapter 772 "shall be entitled to recover reasonable attorney's fees and court costs in the trial

---

[89]There is another possible interpretation of "engage legal counsel"; the phrase could mean that a party that hires legal counsel in response to a contract dispute may recover attorneys' fees even though neither party sues for breach of contract. This interpretation, however, is too absurd to be plausible. Under this interpretation, if the prevailing party to any disagreement concerning the contract, no matter how trivial, could establish that it had to "engage legal counsel" for advice, it could successfully sue for attorneys' fees. This interpretation would encourage disagreement and cause the parties continuously to subsidize each other's procurement of legal advice.

and appellate courts upon a finding that the claimant raised a claim which was without substantial fact or legal support." Fla. Stat. ch. 772.104 (1997). The Florida courts have explained that in awarding fees to a defendant under chapter 772.104, "it is not necessary that the court find a complete absence of a justiciable issue of either law [or] fact. The trial court must only find that the claim lacked substantial fact or legal support." *Hartford Ins. Co. of the Midwest v. Miller,* 681 So.2d 301, 302 (Fla. 3d DCA 1996) (internal quotation marks and citations omitted). This standard is less stringent than the standard for awarding attorneys' fees under other Florida statutory provisions, such as chapter 57.105, which allows for an attorneys' fee award in any civil action that is found to have been brought frivolously or in bad faith. *See Foreman v. E.F. Hutton & Co., Inc.,* 568 So.2d 531, 532 (Fla. 3d DCA 1990) ("The legislature's clear intent in wording section 772.104 as it did was to discourage RICO claims lacking either legal or factual substance by setting a less stringent standard for a fee award than the bad faith standard of section 57.105."). The intent of the Florida legislature in adopting this less stringent standard was "to discourage frivolous RICO claims or claims brought for the purpose of intimidation because the stigma and burden of defending such claims is so great." *Miller,* 681 So.2d at 302. Accordingly, the Florida courts consistently have held that "defendants are entitled to fees under section 772.104 where civil RICO counts were dismissed with prejudice or a verdict was directed in the defendant's favor," and have explained that "a defendant may still be entitled to fees on the RICO count even if the plaintiff ultimately prevails on other counts." *Id.*

In this case, the district court granted the defendants judgment as a matter of law on JEJ's Florida civil RICO claim, thereby directing a verdict in their favor. We have affirmed that judgment and, for the reasons stated in part III.E.2, *supra,* find that the claim lacked "substantial fact or legal support." In particular, we reiterate that all of the allegedly fraudulent conduct directed toward JEJ

73

arises from the 1987 Contract, and the Florida civil RICO statute specifically excludes "two or more incidents of fraudulent conduct arising out of a single contract" from the definition of pattern of criminal activity. Fla. Stat. ch. 772.102(4) (1997). We therefore reverse the district court's decision denying the defendants' requests for fees.

## C. Telesat's and Group's Appeal of Court's Denial of Motion to Tax Costs under Rule 54

Telesat and Group also appeal the district court's denial of their motion for costs under Rule 54 of Federal Rules of Civil Procedure. Rule 54(d)(1) states that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs...." Fed.R.Civ.P. 54(d)(1). The district court denied Telesat's and Group's motions on the ground that neither Telesat nor Group was a prevailing party and, thus, neither was not entitled to costs. Given our disposition of these appeals and of the parties' attorneys' fees claims under Section 35 of the 1987 Contract and Florida Statutes chapter 772.104, we vacate the district court's rulings on costs and remand the case with the instruction that the court reconsider the issue of costs.

## VII.

Our resolution of the appeals is thus as follows: The district court's judgment as a matter of law for Telesat and Group on JEJ's claims for federal RICO (Count I), Florida RICO (Count II), breach of contractual obligation of good faith (Count IV), breach of modified contract (Count V), and fraudulent inducement (Count VIII) is AFFIRMED. The district court's judgment as a matter of law for Capital on all counts is AFFIRMED. The district court's denial of Group's motion for judgment as a matter of law on JEJ's breach of contract (Count III) and tortious interference with contractual relations (Count XI) claims is REVERSED. On receipt of our mandate the district court shall enter judgment for Group on those claims.

The district court's judgment as a matter of law for Telesat on JEJ's breach of contract claim (Count III), insofar as that claim was based on a purported *mileage guarantee,* is AFFIRMED. The district court's denial of Telesat's motion for judgment as a matter of law on JEJ's breach of contract claim (Count III), insofar as that claim was based on *unpaid invoices,* is REVERSED, and the damages award for that claim is VACATED. The district court's denial of Telesat's motion for judgment as a matter of law on JEJ's breach of contract claim (Count III), insofar as that claim was based on *lost profits,* is AFFIRMED but the resulting damages award is VACATED. On receipt of our mandate the district court shall enter judgment for JEJ on Count III for nominal damages no greater than one dollar.

The district court's decisions in relation to attorneys' fees and costs are VACATED, and the case is REMANDED to the district court for reconsideration of attorneys' fees and costs.

In sum, the end result of the parties' appeals is that the plaintiff will receive a judgment on Count III for nominal damages, and will take nothing on the remaining twelve counts of its amended complaint.[90]

We would be remiss if we concluded this opinion without explaining how a fairly simple dispute over the installation of a series of cable television systems could lead to chaotic, expensive, and time-consuming litigation (including trial) on matters that had little relevance to the true matters in dispute. What is there about our method of processing civil cases that permits a case such as this to consume such an enormous portion of the trial and appellate courts' dockets? The problem begins with the manner in which civil cases are pled, a manner that largely ignores the letter and the spirit

---

[90]Even this may create complications—the fact of a judgment for the plaintiff in any amount means a potentially complex decision on remand regarding attorneys' fees and costs.

of the Federal Rules of Civil Procedure and does great disservice to the administration of civil justice. The problem is exacerbated by the district courts' toleration of this practice.

In this case, the problem started with a fifty-page, 173-paragraph complaint that began with thirty-seven paragraphs of general allegations that were incorporated by reference into each count of the complaint.[91] These general allegations operated as camouflage, obscuring the material allegations of JEJ's claims and necessarily implying that all the allegations were material to each claim. This strategy was legitimized by the defendants' decision not to move the district court, pursuant to Rule 12(e), for a more definite statement, or, pursuant to Rule 12(f), to strike from each count the immaterial incorporated general allegations.[92] The defendants instead answered the complaint paragraph-by-paragraph as drafted, and added some affirmative defenses that were as vague and unspecific as the claims that they countered.[93] Then the district court, instead of

---

[91]JEJ's lawyers made token attempts to leave out a few of the general allegations in certain counts of the complaint. The general allegation that "[a]ll conditions precedent to Defendants' liability have occurred, have been excused, or have been performed by JEJ" was not incorporated by reference in the RICO claims. Also, the claims for tortious interference with contractual relations and defamation did not incorporate by reference a few of the general allegations that clearly did not apply to those claims. These efforts are not particularly praiseworthy; however, they set this complaint above some others this court has seen.

[92]The defendants did make a Rule 12(f) motion to strike some of the general allegations from the complaint. Specifically, they moved to strike the allegations of "greenmail" on the grounds that they were immaterial to the breach of contract and defamation claims, and surplusage as to the RICO claims. (The motion said nothing about the other tort claims in this regard.) The motion was denied without opinion.

[93]For instance, the defendants' answers (to both the initial and amended complaints) state, "The claims asserted by plaintiff are barred by the parol evidence rule." The answers do not specify to which claims this defense applies; apparently, the defendants were contending that *all* of JEJ's claims—including its RICO and tort claims—were barred by the parol evidence rule.

demanding repleader on its own initiative,[94] allowed the case to proceed on most of the claims presented by JEJ. The final result was that JEJ recovered $5.5 million at trial on a pair of tort claims—despite the fact that JEJ's true claim was contractual—and on a contract claim (based on the 1987 Contract's right-of-first-refusal provision) that was not alleged in either the initial or amended complaint.

Had the district court carefully sorted through the complaint at the beginning of the litigation, it would have realized that the general allegations of "greenmail" and fraud on the franchising authorities were irrelevant to the case, and that the case was essentially a two-fold breach of contract action. The first breach of contract claim was for $977,000 in unpaid invoices. This claim actually consisted of several claims, or suits on individual construction contracts, for money Telesat owed JEJ for work performed. Having drawn this conclusion, the district court would have required JEJ to plead each claim in a separate count. *See Fikes v. City of Daphne,* 79 F.3d 1079, 1082 (11th Cir.1996). Telesat, in turn, would have pled as setoffs the amounts JEJ owed it because it had performed work that JEJ was obliged to perform. Because the sums due JEJ on unpaid invoices and the setoffs due Telesat were not in dispute, the district court could have recognized that Telesat's setoffs exceeded the sums due JEJ and avoided sending this claim to trial.[95]

Once the unpaid invoices claims were isolated, the only remaining claim would have been the mileage guarantee. The invalidity of this claim, standing alone (as a consequence of the

---

[94]District courts have the inherent authority to demand repleader *sua sponte. See Fikes v. City of Daphne,* 79 F.3d 1079, 1083 n. 6 (11th Cir.1996).

[95]If a complicated accounting were required, the claim could have been referred to a special master. *See* Fed.R.Civ.P. 53.

repleader), would likely have been clear to the district court.[96]  Instead, because the mileage guarantee claim was buried underneath a series of general allegations and frivolous tort claims, it took the district court until the close of the evidence at trial to strike the alleged mileage guarantee from the complaint.

In addition, had the district court realized earlier that this was nothing more than a breach of contract action, it might have paid closer attention to the 1987 Contract.  Had it done so, it would have realized that this "contract," like its predecessor (the 1986 Contract), was merely a set of standard terms for a series of future contracts;  the initial "contract" did not require Telesat to develop any cable systems and did not require JEJ to do anything.  Thus, the claim for lost profits resulting from the breach of the right-of-first-refusal provision never would have arisen.

This case is part of a broader phenomenon that we have previously labeled "shotgun pleading."[97]  These types of cases invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief.  The general allegations are incorporated by reference into each count of the complaint;  the complaint is followed by an answer that responds to each and every statement.  If the trial judge does not quickly demand repleader, all is

---

[96]Count III of JEJ's complaint, entitled "Breach of Contract," thus combined a mileage guarantee claim and a series of unpaid invoices claims.  This flies in the face of the requirement that each claim for relief should be stated in a separate count.  *See Fikes,* 79 F.3d at 1082.

[97]*See Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162, 165 (11th Cir.1997) ("[Plaintiff's] complaint is typical of the sort of shotgun notice pleading we have encountered in scores of cases brought before this [c]ourt.");  *Pelletier v. Zweifel,* 921 F.2d 1465, 1518 (11th Cir.1991) ("[Plaintiff's complaints] are quintessential "shotgun' pleadings, replete with factual allegations that could not possibly be material to any of the causes of actions they assert.").  Judge Moore, at the "final" pretrial conference in this case (*see supra* note 27), described the case as a "simple little breach of contract case [that has become] a monumental federal litigation" as the result of a "shotgun complaint."

lost—extended and largely aimless discovery will commence,[98] and the trial court will soon be drowned in an uncharted sea of depositions, interrogatories, and affidavits. Given the massive record and loose pleadings before it, the trial court, whose time is constrained by the press of other business, is unable to squeeze the case down to its essentials; the case therefore proceeds to trial without proper delineation of issues, as happened here. An appeal ensues, and the court of appeals assumes the trial court's responsibility of sorting things out. The result is a massive waste of judicial and private resources; moreover, "the litigants suffer, and society loses confidence in the court[s'] ability to administer justice." *Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162, 165 (11th Cir.1997).

We recognize the time pressures that the federal district courts face because of crowded dockets; it is much easier in the short term to permit shotgun pleadings—in the hope that the parties will settle their dispute—instead of intervening *sua sponte* to narrow the issues. In the long term, however, the judicial work that results from shotgun pleading is far more time consuming than the work required up front to prevent the case from proceeding beyond the pleadings until the issues are reasonably well defined. As we have previously stated, and state once again, district courts have the power and the duty to define the issues at the earliest stages of litigation. *See Ebrahimi,* 114 F.3d at 165 (11th Cir.1997); *Fikes,* 79 F.3d at 1082-83 & n. 6 (11th Cir.1996); *Anderson v. District Bd. of Trustees of Cent. Fla. Community College,* 77 F.3d 364, 367 n. 5 (11th Cir.1996).

SO ORDERED.

VINING, Senior District Judge, Sitting by Designation, concurring in part and dissenting in part:

---

[98]This extensive discovery is driven at least in part by the practice of paying attorneys by the hour.

While I concur in substantially all of Judge Tjoflat's opinion, I respectfully dissent from that portion wherein he remands the matter for reconsideration of attorney's fees and costs. This case has dragged out way too long and should be put to rest. All parties share some responsibility for this protracted litigation, and I would simply leave the parties where they are now, with each being required to bear its own costs and attorney's fees.